494 So.2d 1342 (1986)
Carolyn Sue PHILLIPS, Individually and in Her Capacity as Natural Tutrix of the Minor Children, Travis Earl and Tarron Phillips, Plaintiffs-Appellants,
v.
William Glen ROY, Gibson's Inc., Sentry Insurance and State of Louisiana, Through the Louisiana Health and Human Resources Administration, Division of Mental Health Central Louisiana State Hospital, Defendants-Appellees.
No. 18045-CA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 1986.
*1343 Edward Larvadain, Jr., Alexandria, for plaintiffs-appellants Carolyn Sue Phillips, et al.
Steven R. Giglio, Baton Rouge, for defendant-appellee State.
Bodenheimer, Jones, Klotz & Simmons by Harry D. Simmons, Shreveport, for defendants-appellees Gibson's, Inc. and Sentry Ins.
Before HALL, MARVIN and FRED W. JONES, Jr., JJ.
*1344 HALL, Chief Judge.
Plaintiff, Carolyn Sue Phillips, individually and as tutrix for her two minor children, filed suit against William Glen Roy, Gibson's Incorporated, Sentry Insurance Company, and the State of Louisiana through the Louisiana Health and Human Resources Administration, Division of Mental Health, Central Louisiana State Hospital seeking damages for the wrongful death of her husband, Earl Phillips. Phillips was shot by Roy, a paranoid schizophrenic who had been treated and released from Central Louisiana State Hospital 19 months before he went on a rampage, randomly shooting at black people.[1] Defendants Gibson's and its insurer, Sentry, filed a third party demand against the state seeking contribution in the event plaintiffs prove any negligence on their part. Likewise, the state filed a third party demand against Gibson's and Sentry seeking contribution in the event that plaintiffs prove any negligence on the part of the hospital.
Plaintiff settled and dismissed her claim against Gibson's and Sentry prior to trial.[2] Plaintiff's case was consolidated with two other cases claiming damages for wrongful death due to the negligence of defendants. The claims of other plaintiffs against Gibson's and its insurer were tried before a jury and ended in a mistrial when the jury could not reach a verdict. Plaintiff's claim against the state was tried before the judge, who ruled in favor of the state and against plaintiff. In his written reasons for judgment, the trial judge held that assuming for the purpose of argument that the hospital's action or inaction was a cause-in-fact of the death of plaintiff's husband and that the hospital owed a duty to plaintiff's husband, the hospital did not breach that duty. For reasons expressed in this opinion, we affirm the judgment of the trial court.
Plaintiff's appeal of the trial court judgment raises the following issues: (1) whether the actions of the hospital were a cause-in-fact of the death of plaintiff's husband; (2) whether the hospital owed a duty to plaintiff's husband to protect him from injury resulting from actions by the patient who was treated and released from the hospital; and (3) whether if such a duty was owed to plaintiff's husband by the hospital, was that duty breached when the hospital discharged the patient after twenty-nine days of treatment, failed to notify the local court of the patient's release, and failed to monitor Roy's treatment after his discharge.

FACTS
Over a ten year period, defendant Roy had been hospitalized five times at the Central Louisiana State Hospital and one time at a hospital in Dallas, Texas for mental illness. His condition was diagnosed as schizophrenic paranoia acute accompanied by aggressive behavior. Roy was last hospitalized for twenty-nine days in the Central Louisiana State Hospital and was discharged on July 13, 1977.
During Roy's last hospitalization, he was cooperative and was neither threatening nor hostile toward anyone within the hospital. Roy went home on passes for two successful visits during this period of confinement. After Roy's return from the second pass, his wife requested that he be allowed to come home; Roy wanted to go home. Dr. A.H. King, Jr., Roy's treating physician, found that Roy's psychosis was in remission at the time of his discharge and that he would receive no further benefit by remaining in the hospital. Dr. King felt that further hospitalization would be detrimental. Upon his discharge, Roy was taking an anti-psychotic drug and was provided with a supply of the drug which would last him until the scheduled date of his appointment at a local mental health *1345 clinic. His family was aware of the need for Roy to continue his medication. Roy continued his medication and therapy until October of 1978. During this period he was employed as a pulpwood hauler and also attended trade school. He had separated from his wife and at the time the tragic episode giving rise to this suit occurred, he and his two children were living with his mother.
Although Roy disliked the color black and tended to associate it with bad things, he made no specific or immediate threats of bodily harm against any individual black person or against black people as a whole. During the course of his illness, Roy made six threats of a homicidal nature, five of those toward family members and one toward an outsider, and four threats of a suicidal nature. None of these threats were ever carried out; Roy had never harmed anyone. The number of threats made by Roy decreased as he progressed, and his initial aggression toward others became focused upon himself.
On February 28, 1979, more than nineteen months after his discharge from the hospital, and four months after he stopped going to the mental health clinic and stopped taking his medicine, Roy left his place of employment as a pulpwood hauler and went to Gibson's Discount Center where he purchased a .357 Magnum pistol and one hundred rounds of ammunition. Upon leaving Gibson's, Roy drove around the town of Winnfield, Louisiana randomly shooting at black people. Earl Phillips, the husband and father of plaintiffs in this action, was killed by a shot fired by Roy.

DISCUSSION
The following inquiries must be made in order to determine legal responsibility in tort claims: (1) whether the conduct of which the plaintiff complains was a cause-in-fact of the harm; (2) whether there was a duty on the part of the defendant to protect the victim against the risk involved; (3) whether there was a breach of that duty. Hill v. Lundin & Assoc., 260 La. 542, 256 So.2d 620 (1972); Dixie Drive It Yourself System v. Am. Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Martin v. Piggly Wiggly Corp., 469 So.2d 1057 (La.App. 2d Cir.1985).
Conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm. Thomas v. Missouri Pacific Railroad, 466 So.2d 1280 (La. 1985); Ward v. Louisiana and Arkansas Railway, 451 So.2d 597 (La.App. 2d Cir. 1984). In other words, it is an act or failure to act without which the accident would not have occurred. Dixie Drive It Yourself System v. American Beverage Co., supra; Ward v. Louisiana and Arkansas Railway, supra. Plaintiff's husband would not have been shot by Roy if Roy had not been released from the hospital. Therefore, the hospital's release of Roy can be said to have been a cause-in-fact of Roy's death.
The only reported Louisiana cases addressing the duty owed by a mental hospital to the general public for the harm occasioned by a released mental patient are Cappel v. Pierson, 15 La.App. 524, 132 So. 391 (La.App. 2d Cir.1931) and Ross v. Central La. State Hospital, 392 So.2d 698 (La. App. 3d Cir.1980).
In Cappel, Smith was committed to the Central Louisiana State Hospital on January 29, 1929. He escaped from the hospital on March 16, 1929, but was returned on November 8, 1929. Smith was released on the morning of the following day, and on the evening of the same day, he killed Dr. Cappel. Suit against the hospital superintendent was brought by the widow of Dr. Cappel. In affirming the trial court's judgment sustaining defendant's exception of no cause of action, this court held that the good faith of the defendant as a state officer exercising discretionary authority in releasing Smith could not be questioned, but even if it could be questioned, his negligence in so doing was not the proximate cause of Dr. Cappel's death.
In Ross, Vivian Ross was discharged from Central Louisiana State Hospital on August 5, 1977. On March 11, 1978, she shot and killed her daughter and shot and injured her son. In a suit for the death and *1346 injury of the children, her husband and the children's father asserted that the hospital had a duty to warn the family of Mrs. Ross that if she did not take her medication she would become violent. Mrs. Ross's condition had been diagnosed as schizophrenia, schizo-affective type which characteristically distorts a person's perception of reality causing a disturbance in their thinking ability. The medication taken by Mrs. Ross was used to improve her thinking ability, but not to control violence. Mrs. Ross's treating psychiatrist testified that Mrs. Ross knew the importance of taking her medication and was able to comply with the instructions. Both her treating psychiatrist and the hospital administrator testified that at the time Mrs. Ross was released she had never shown any propensity toward violence and was not a proper candidate for commitment because she was not considered dangerous to herself or to others. The Third Circuit found there was no evidence that Mrs. Ross had failed to take her medication at the time of the attacks on her children, nor was there any showing of a causal connection between the failure of Mrs. Ross to take her medication and her attack on her children. Although the issue of the negligence of the hospital in releasing Mrs. Ross was not argued, the court stated that under the circumstances, the hospital could not have foreseen the actions of Mrs. Ross, and there was no duty to warn third persons of possible dangers which are unforeseeable.
An analogous case is Frank v. Pitre, 353 So.2d 1293 (La.1978), in which suit was brought against the Sheriff of Evangeline Parish for injuries suffered by the plaintiff policeman in an attempt to quell a barroom disturbance caused by a man who was incarcerated in the parish prison on a parole violation but had been granted a temporary weekend pass. In reversing the judgment in favor of the plaintiff, the Supreme Court stated:
It is not enough to say that if Dick had not been released under the sheriff's policy of weekend passes, the tragedy would not have occurred. If Dick's friend had not given him a ride to town the shooting would not have happened. There must be something more; there must be a closer connection between the act of the defendant and the injury of the plaintiff.... even though a reasonable man might have concluded, if he had thought about it, that a prisoner allowed to go home on Saturday might have gotten into a brawl in a saloon and shot a policeman. Whatever the theoretical basis for liability is called, the claimed cause of the injury (the release of Dick) did not sufficiently contribute to the injury to create liability in defendant.
Frank, at p. 1296.
Justice Tate concurred in the Frank v. Pitre decision that any violation of duty was not the proximate or "legal" cause of the plaintiff's injuries, noting that for a violation of duty to be a legal cause of an injury the violation must not only be a cause-in-fact of the injury but the duty violated must have included the prevention of the risk encountered by the plaintiff. The sheriff's duty to confine the prisoner did not include within its scope the protection of third persons from injury should the prisoner be released. Justice Tate preferred to rest the decision solely upon this analyses of proximate or "legal" cause, rather than upon pre-Dixie Drive-It Yourself principles.
In none of the three cases discussed was the duty of a mental hospital or other authority to the public in connection with the release of a mental patient precisely defined, those cases being decided on issues of proximate or legal cause or scope of duty. Likewise, in the instant case it is not necessary to precisely define the duty of the state mental hospital.
Assuming that the state hospital owed a general duty to the public to exercise reasonable care in the discharge of potentially dangerous patients, that duty did not extend to this particular victim or, stated otherwise, the duty did not include within its scope the protection of this victim from the particular risk he encountered. The duty did not encompass the risk *1347 that more than nineteen months after the patient's release, Roy would go on a shooting spree killing black people including plaintiff's husband. There is no ease of association between the hospital's release of Roy and the bizarre behavior which resulted in the death of Mr. Phillips. The connection between the conduct complained of and the harm suffered is too attenuated to impose liability on the state, whether it be explained as lack of proximate or legal cause, lack of duty owed to this victim, or lack of inclusion of this risk within the scope of the duty.
Roy was admitted to the hospital on June 14, 1977, by a coroner's order pursuant to LSA-R.S. 28:52. At that time, admission under a coroner's order differed from judicial commitment provided for in LSA-R.S. 28:53 in that a patient could only be confined for a maximum period of sixty days without initiation of a judicial commitment proceeding. A showing that the patient suffered from a mental illness which caused him to be dangerous to himself or others or incapable of caring for himself or his personal safety was necessary for confinement under either procedure. The patient had the right to be discharged as soon as he had been restored to reason and had become competent to manage his own affairs. LSA-R.S. 28:171(A)(6). The superintendent of the hospital had the authority to discharge the patient if he believed that the patient had sufficiently recovered and that no harm would result from his discharge. LSA-R.S. 28:96.[3]
Roy showed no present signs of being dangerous to himself or to others or incapable of caring for himself or his personal safety at the time he was discharged from the hospital. Under such circumstances, the hospital had no authority to continue Roy's confinement and no grounds to seek judicial commitment, but rather had a duty to release him. Assuming a duty of reasonable care on the part of the hospital in releasing a patient, the hospital did not breach that duty in releasing Roy. Further treatment was not indicated and would have been counter-productive. His illness was in remission and under control. The hospital's discretion was exercised in accordance with good mental health standards and in accordance with statutory policy. The fact that Roy lived a relatively normal life for nineteen months after his discharge supports the reasonableness of the hospital's action at the time he was discharged.
At the time of Roy's discharge, the hospital serviced forty-two parishes. It was the hospital's policy to counsel both the patient and at least one member of the patient's family concerning the importance of continued use of medication and continued contact with a mental health clinic. Upon discharge, a patient was referred to a mental health center conveniently located near his home and an initial appointment at the clinic was made for him. Also at this time, a detailed, written patient history was forwarded to the local mental health clinic. The hospital had no follow-up program for the discharged patient, but did, in some instances, receive feedback from the local mental health clinics as to whether the patient was keeping his appointments. This same procedure was followed with Roy when he was discharged. The hospital had no authority to compel Roy to take his medication or to attend therapy at the local mental health clinic. Therefore, the hospital had no duty to monitor Roy's treatment after his discharge.
*1348 Plaintiff argues that the hospital had a duty to notify the local authorities of Roy's release under Tarasoff v. Regents of the University of Calif., 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976); Petersen v. State, 100 Wash.2d 421, 671 P.2d 230 (1983); and Lipari v. Sears, Roebuck & Co., 497 F.Supp. 185 (D.Neb.1980). These cases recognize a duty of a psychotherapist to take reasonable precautions to protect potential victims against the dangerous propensities of his patient. Tarasoff is limited to identifiable victims, while Lipari and Petersen extend to foreseeable victims. All three are limited to circumstances where the psychotherapist is aware or should be aware of the risk of harm posed by the patient. At the time of Roy's release, there was no statutory duty owed by the hospital to notify the local authorities of the discharge of a patient admitted under a coroner's order. If the hospital owed a duty to take reasonable precautions to protect potential victims against the dangerous propensities of a released patient, that duty was not breached in this case by the failure of the hospital to notify the local court authorities of Roy's release when Roy had not exhibited any dangerous tendencies, particularly as to any identifiable or foreseeable victims.

DECREE
The judgment of the district court in favor of defendant, the State of Louisiana through the Louisiana Health and Human Resources Administration, Division of Mental Health, Central Louisiana State Hospital, is affirmed. The costs of appeal are assessed to plaintiff.
AFFIRMED.
NOTES
[1] See State v. Roy, 395 So.2d 664 (La.1981) in which Roy's conviction of first degree murder was reversed upon a holding that he had proven his insanity defense.
[2] See Phillips v. Roy, 431 So.2d 849 (La.App. 2d Cir.1983) in which this court reversed a summary judgment in favor of Gibson's and its insurer and remanded the case to the district court for further proceedings.
[3] Roy's discharge from the state hospital on July 13, 1977 occurred prior to the September 7, 1977 effective date of Act 714 of 1977 which comprehensively revised the Mental Health Law. LSA-R.S. 28:171 J presently provides:

J. Every patient shall have the right to be discharged from a treatment facility when his condition has changed or improved to the extent that confinement and treatment at the treatment facility are no longer required. The director of the treatment facility shall have the authority to discharge a patient admitted by judicial commitment without the approval of the court which committed him to the treatment facility. The court shall be advised of any such discharge. The director shall not be legally responsible to any person for the subsequent acts or behavior of a patient discharged by him in good faith.