**Venkataramana NAIDU, Defendant Below, Appellant,**

v.

**Ann D. LAIRD, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Dec. 3, 1987.
Decided: April 11, 1988.

Michael F. Foster, State Sol., John J. Polk (argued) and Ann Woolfolk, Deputy Attys. Gen., Dept. of Justice, Wilmington, for appellant.

Richard D. Allen (argued) and Jeffrey S. Welch, of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellee.

Robert J. Katzenstein of Lassen, Smith, Katzenstein & Furlow, Wilmington, and Joseph N. Onek and Rebecca L. Brown of Onek, Klein & Farr, Washington, D.C., of counsel, for Delaware Psychiatric Ass'n and the Nat. Ass'n of State Mental Health Program Directors, amici curiae.

Before CHRISTIE, C.J., HORSEY, J., and JACOBS, Vice Chancellor [sitting by designation pursuant to Del. Const. art. IV, § 12].

CHRISTIE, Chief Justice:

This case stems from a wrongful death action brought by the plaintiff/appellee, Ann D. Laird, against defendant/appellant Venkataramana Naidu (Dr. Naidu) and defendants Robert W. Buckley (Dr. Buckley) and Chong H. Un (Dr. Un) who were psychiatrists employed at the Delaware State Hospital (DSH).[1] On September 6, 1977, Mrs. Laird's husband, George W. Laird, was killed when his vehicle collided with a vehicle driven by Hilton W. Putney (Putney). Putney, who has a long history of mental illness, apparently drove his automobile deliberately into Mr. Laird's vehicle. At the time of the accident, Putney was in a psychotic state. Putney was charged with manslaughter but found not guilty by reason of insanity. Five and one-half months prior to the fatal accident, Putney had been treated for a seventh time at DSH. Mrs. Laird alleged that the defendants were grossly negligent[2] in the care, treatment, and discharge of Putney from DSH and that such gross negligence was a proximate cause of her husband's death.

On November 21, 1986, a Superior Court jury returned a special verdict in favor of Mrs. Laird and against Dr. Naidu in which it concluded that Dr. Naidu was grossly negligent and that such gross negligence was a proximate cause of Mr. Laird's death. The jury awarded Mrs. Laird damages in the amount of $1.4 million. The jury found in favor of the other defendants, Drs. Buckley and Un.

In this appeal, Dr. Naidu challenges the Superior Court's rulings which denied his motion for summary judgment, his motion for a directed verdict, and his motion for judgment notwithstanding the verdict. Dr. Naidu contends that: 1) no duty required him to prevent a former patient from causing injury to members of the public at large; and in any event 2) as a matter of law, his treatment of Putney was not a proximate cause of Mr. Laird's death. We rule that the Superior Court correctly instructed the jury concerning the duty of reasonable care and did not err in ruling that there exists substantial evidence to support the jury's verdict that Dr. Naidu breached that duty under circumstances which demonstrated gross negligence on his part. We also rule that the Superior Court did not err in rejecting Dr. Naidu's argument that his actions were not, as a matter of law, a proximate cause of Mr. Laird's death. Rather, under the circumstances of this case, the determination of whether there was a breach of a duty involving gross negligence and whether this breach was a proximate cause of Mr. Laird's death was correctly left to the jury. We, therefore, affirm the rulings of the Superior Court.

## I. FACTUAL BACKGROUND

Mr. Putney has an extensive history of mental illness involving numerous mental health institutions and psychiatrists. As early as 1959, when he was in the Army,

---

1. The original complaint named as defendants the Department of Health and Social Services and the Delaware State Hospital. The claims against the State agencies were subsequently dismissed on the grounds of sovereign immunity. *Laird v. State*, Del.Super., No. 79C–JA–97, Taylor, J. (Jan. 12, 1982), *aff'd*, Del.Supr., 499 A.2d 1175 (1985).

2. The original complaint was based on allegations of simple negligence but was subsequently amended with permission of the Superior Court.

Putney was diagnosed as suffering from severe and chronic paranoid schizophrenia. He was discharged from the Army because of this condition and was married shortly thereafter. The marriage was punctuated with domestic disputes and at one point Putney threatened to kill his wife. In 1962, Putney's psychiatrist noted the recurrences of psychotic thoughts and behavior, and Putney continued to be treated with anti-psychotic medication on an outpatient basis.

In June, 1965, Putney's numerous commitments to hospitals began. The facts surrounding these commitments are summarized below.

1) *Agnew State Hospital*, San Jose, CA (June 17—December 3, 1965)—Committed in June, 1965 and transferred to a V.A. hospital in Menlo Park, CA in August, 1965. Doctors noted that the relapse into a psychotic state was touched off by Putney's refusal to take anti-psychotic medicine. Putney was discharged in December, 1965, but received outpatient treatment for the next several years.

2) *V.A. Hospital*, Coatesville, PA (August 20—October 24, 1968; December 20, 1968—January 16, 1969)—Initially discharged in October, 1968, Putney was readmitted two months later in December after slashing his wrists and taking an overdose of medication. Putney was released to a community residence home where his medication could be supervised.

3) *Delaware State Hospital* (April 17, 1969)—Putney was brought to the hospital in full restraints by police and admitted on an emergency basis. Putney was certified as dangerous to himself and others and was involuntarily committed. Dr. Naidu noted Putney's irrational behavior and suicidal tendencies.

4) *V.A. Hospital*, Coatesville, PA (April 18—June 16, 1969; August 7, 1969—February 24, 1970)—Putney was transferred to the V.A. Hospital from DSH. Less than two months after his release, Putney was again hospitalized in Coatesville. He was eventually discharged and referred to an outpatient clinic.

5) *Delaware State Hospital* (December 13, 1970—January 18, 1971)—Putney was brought to the hospital after threatening to rape his landlord's wife. He was medically committed three days later. Putney was again certified to be a "dangerous, mentally ill person, hostile and combative and dangerous to others." While at the hospital, Putney physically attacked several employees. The discharge report noted that Putney was not reliable as far as taking his medicine. Putney was referred to the Elsmere V.A. Hospital for outpatient treatment.

6) *V.A. Hospital*, Coatesville, PA (January 23—June 8, 1971)—Five days after being discharged by DSH, Putney was again hospitalized after doctors at the Elsmere V.A. Hospital determined that he required hospitalization.

7) *Delaware State Hospital* (November 5—December 13, 1971)—Putney was admitted to DSH on a 72-hour emergency commitment after becoming violent and abusive. DSH psychiatrists certified Putney to be dangerous to others and he was medically committed.

8) *V.A. Hospital*, Perry Point, MD (December 13, 1971—March 11, 1972; March 21—22, 1972)—Transferred from DSH for inpatient psychiatric treatment. Dr. Huxtable noted that Putney was a "time bomb." Shortly after discharge, Putney was again readmitted but discharged the next day against medical advice.

9) *Delaware State Hospital* (April 8—June 29, 1972)—Putney was admitted for a fourth time pursuant to a Municipal Court order after being charged with disorderly conduct.

10) *V.A. Hospital*, Perry Point, MD (June 29—August 15, 1972)—Transferred from DSH. Psychiatrists noted that Putney should be committed by a court order because he was dangerous to himself and others especially if he should drive an automobile in his then present condition.

11) *Delaware State Hospital* (September 13—27, 1972)—Putney was admitted for the fifth time after intentionally ramming a police vehicle with his automobile. Putney was found to be "grossly psychotic" and

was again certified to be a "dangerous mentally ill person".

12) *V.A. Hospital,* Perry Point, MD (November 8—December 15, 1972)—Doctors once again determined that Putney's explosive behavior was touched off by his failure to take prescribed medicine. Putney's history of violent behavior was noted.

13) *V.A. Hospital,* Kansas City, MO (February 12—April 25, 1973)—Putney became psychotic after discontinuing medication. Doctors noted that Putney was delusional and paranoid. His prognosis was "Fair if patient takes his medications."

14) *Delaware State Hospital* (May 13—September 7, 1973)—Putney was admitted on an emergency basis after attempting suicide by setting fire to a tire in his apartment hoping that the fumes would kill him. This was Putney's sixth stay at DSH.

15) *V.A. Hospital,* Perry Point, MD (September 7, 1973—February 20, 1974)—Transferred from DSH. This was Putney's fifth stay at the hospital. Doctors noted that Putney's frequent hospitalizations occur when he stops taking his medication. The prognosis was listed as "guarded". Putney was discharged to live in a community residence home as part of his outpatient treatment.

16) *V.A. Hospital,* Perry Point, MD (December 23, 1974—April 11, 1975)—Putney was initially sent to the Wilmington Medical Center on September 28, 1974, after cutting a large gash in his left wrist and then driving his car off the road at a high rate of speed which caused the car to overturn. Putney was transferred to Elsmere V.A. Hospital and then to Perry Point V.A. Hospital. Putney was certified by two psychiatrists as both suicidal and homicidal. Putney's failure to take prescribed medicine was again noted. Putney's left hand was permanently deformed.

17) *V.A. Hospital,* Perry Point, MD (June 24—July 3, 1975)—Putney was admitted after attempting to drown himself. Putney's community residence caseworker noted that Putney had made no progress towards independent functioning and stated that all other efforts would be a waste of time until Putney accepted responsibility for taking his medication.

18) *V.A. Hospital,* Perry Point, MD (August 16—October 28, 1975)—Putney was admitted to the closed ward and stabilized with medication. Medical records reflect that Putney was "a well-known patient with many admissions." Putney's community residence caseworker wrote in his medical records:

"I have recorded in a Closing Summary dated 7–8–75 that Mr. Putney had been discharged just ten days after making a suicide attempt, that he had no place to go, no departure plans, that he still exhibited several symptoms of mental illness, and that Social Work Service was not involved and I did not accept responsibility for possible consequences. I did not even know his address....

"I wrote on 7–8–75 that when Mr. Putney told me on 7–3–75 that he was being discharged that I believed that he was expressing another delusion. How could a physician discharge such a sick patient ten days after he made a suicide attempt? ...

"The consequences of off-hand, careless, indifferent medical malpractice in this case can be very tragic."

19) *Delaware State Hospital* (March 7—March 22, 1977)—Putney's seventh admittance to DSH and the concern of this litigation.

On March 7, 1977, police brought Putney to DSH and secured a 72–hour emergency commitment after he locked himself in a hotel room. 16 *Del.C.* § 5122(d).[3] His failure to take prescribed medication was

---

**3.** (d) Upon receiving an alleged mentally ill person at the Delaware State Hospital, the Superintendent shall detain, care for and treat the said patient for a period not to exceed 72 hours, excluding Saturdays, Sundays and holidays. If it appears that the nearest known relative has not received prior notice of the proceedings the Superintendent shall, if reasonably possible, promptly give such notice. Unless the patient is discharged from the Hospital as cured within that period, then at the termination of the period he shall be discharged unless he is admitted or committed to the said Hospital under some other provision of law. 16 *Del.C.* § 5122(d).

blamed for this psychotic episode. Putney signed a voluntary hospitalization application which enabled doctors to keep Putney without court action. Putney was once again certified to be a "dangerous mentally ill person dangerous to self and others."

On March 16, 1977, Putney was transferred from the admission ward to a treatment ward under the direction of Dr. Naidu. On March 17, Putney became hostile after refusing to take his medication. Throughout his stay, Putney was demanding and uncooperative.

On March 18, Putney submitted a written request to be discharged. Because he was a voluntarily committed patient, DSH had five days to either release Putney or involuntarily commit him.

Putney's treatment team, which was headed by Dr. Naidu, met on March 22 to consider his release. The decision was made to discharge Putney on that same day.

Prior to rendering its decision, the treatment team reviewed Putney's data base, which is a digest and compilation of a patient's prior medical records created by the admission team; his social history; his problem sheet; his treatment plan; and his treatment offered. Dr. Naidu relied on the data base and, therefore, did not independently review all of the medical records from Putney's six prior hospitalizations at DSH or the medical records from the Perry Point V.A. Hospital which were on file at DSH. Dr. Naidu did not review the complete records from the March 7, 1977 commitment which indicated that Putney may have been spitting out his medication.

Upon discharge, which occurred after only fifteen days of hospitalization, Putney was given a thirty day supply of his medication and told that an appointment for him had been made at the Elsmere V.A. Hospital. Immediately after discharge, Putney ceased taking his medication, and he subsequently failed to appear for his scheduled appointment at the Elsmere V.A. Hospital. He had actually moved to New York and had enrolled in college classes. He led a rather unremarkable life until September 6, 1977, when, in a psychotic state, he drove his car into that of George Laird with tragic results.

The trial was, in a large part, a battle of experts. Plaintiff, Mrs. Laird, called as an expert witness Dr. V. Terrell Davis who, until 1983, had been Director of Psychiatry at the Wilmington Medical Center. Dr. Davis had a long and distinguished career at both public and private psychiatric facilities. Dr. Davis testified that Dr. Naidu was grossly negligent in the treatment and discharge of Putney and that such gross negligence was a proximate cause of Mr. Laird's death. Dr. Davis noted the following errors: 1) Dr. Naidu's conclusion that Putney had received the maximum benefits from hospitalization; 2) the discharge of Putney on a a very high dosage of medication; 3) the discharge without a program for continuing care; 4) the discharge without an early appointment at which his medication could be monitored; 5) the failure to address Putney's inconsistency in taking prescribed medicine; and 6) the failure to consider other alternatives that were available such as referral to an outpatient facility, transfer to a V.A. hospital, and involuntary commitment to DSH. It was Dr. Davis' opinion that Putney was a danger to himself on March 22, 1977, and that he could have been involuntarily committed.

The defendants called Dr. Raskin who essentially offered an opposite viewpoint and disagreed with most of Dr. Davis' testimony. Dr. Raskin quarrelled with whether Putney was truly dangerous.

In returning a verdict of $1.4 million against Dr. Naidu and for Mrs. Laird, the jury indicated that it found Dr. Davis' testimony the more persuasive.

In this appeal, Dr. Naidu challenges two legal determinations of the Superior Court. First, Dr. Naidu contends that the Superior Court erred in rejecting the argument that he owed no duty to protect the public at large from Putney. More specifically, Dr. Naidu contends that since Putney posed no present danger to himself or others at the time of his discharge, Dr. Naidu, as a matter of law, had no choice but to release him. Consequently, Dr. Naidu argues that this Court should reject imposition of liability

on state-employed psychiatrists for the harm inflicted by patients who the psychiatrists were obligated to release. Dr. Naidu's second contention is that the Superior Court erred in submitting the issue of proximate cause to the jury because, as a matter of law, the links between Dr. Naidu's treatment of Putney and the fatal crash were so remote as to be legally insufficient. We find that the Superior Court made no errors of law and that the factual findings of the jury were supported by evidence in the record. Therefore, we affirm the rulings of that court.

## II. DUTIES OWED

The determination of the existence and scope of a legal duty presents mixed questions of law and fact. The ultimate question of whether "such a relationship exists between the parties that the community will impose a legal obligation upon one for the benefit of the other" is an issue for the court. W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser & Keeton on Torts* § 37, at 236 (5th ed. 1984) (hereinafter *"Prosser & Keeton on Torts"*). Delaware law measures duties owed in terms of reasonableness. *Delmarva Power & Light Co. v. Burrows*, Del.Supr., 435 A.2d 716, 718 (1981). One's duty is to act reasonably, as a reasonably prudent man (or entity) would. *Id.* The determination by the court of that duty must be formulated in each particular case in light of its peculiar facts. *Robelen Piano Co. v. Di Fonzo*, Del.Supr., 169 A.2d 240, 245 (1961).

■ Accordingly, determining the existence and parameters of a duty is a question of law which this Court may review *de novo* based on the particular facts presented. *E.I. duPont de Nemours v. Shell Oil*, Del.Supr., 498 A.2d 1108, 1113 (1985). On any issue of related fact, the Court will view the evidence in the light most favorable to the appellee. *Newark Trust Co. v. Bruwer*, Del.Supr., 141 A.2d 615, 616 (1958). Insofar as Dr. Naidu's appeal challenges the jury's factual determinations, these findings will not be disturbed if there is any competent evidence upon which the verdict could reasonably be based. *Turner v. Vineyard*, Del.Supr., 80 A.2d 177, 179 (1951).

■ Dr. Naidu contends that, in Delaware, neither statutory provisions nor the common law support the existence of a duty requiring a state-employed psychiatrist to prevent former patients from causing injury to members of the public at large. On March 16, 1977, when Putney requested a discharge pursuant to 16 *Del.C.* § 5123(e), DSH had five days to execute his discharge or have him involuntarily committed. 16 *Del.C.* § 5123(e), (f).[4]

The procedures and prerequisites for provisional involuntary admittance by a psychiatrist's certification are set forth in detail in 16 *Del.C.* ch. 50. At the crux of these procedures is the requirement that:

> No person shall be involuntarily admitted to the hospital as a patient except pursuant to the written certification of a psychiatrist that based upon the psychiatrist's examination of such person, such person suffers from a disease or condition which requires him to be observed and treated at a mental hospital for his own welfare and which either renders such person unable to make responsible decisions with respect to his hospitalization, or poses a present threat, based upon manifest indications, that such person is likely to commit or suffer serious harm to himself or others or to property, if not given immediate hospital care and treatment....

**4.** (e) A voluntary patient who requests his discharge or whose discharge is requested, in writing, by his legal guardian, parent, spouse or adult next of kin shall be discharged within 5 days from the receipt of the request, except that (1) if the request for discharge is made by a person other than the patient, discharge may be conditioned upon the agreement thereto of the patient, and (2) if the patient is under the age of 18 years his discharge may be conditioned upon the consent of his parent, spouse or guardian.

(f) Nothing contained in subsection (e) of this section shall require the discharge of a voluntary patient if within the 5 day period from receipt of the request for discharge he is admitted or committed to the said Hospital under some other provision of law....
16 *Del.C.* § 5123(e), (f).

16 *Del.C.* § 5003.[5]

Dr. Naidu contends that this statute defines the duty to which he must conform and since on the date of discharge, Putney presented no risk of harm to himself or others, Dr. Naidu had a statutory obligation to release him. However, there was expert testimony from Dr. Davis that Putney was a present danger to himself on March 22 and that he was eligible for involuntary commitment. Dr. Davis' opinion was more than a professional disagreement with Dr. Naidu's evaluation of Putney's propensity for harm. Rather, Dr. Davis testified that Dr. Naidu was grossly negligent in performing his statutory duties. DSH records from the March 7, 1977 hospitalization indicated that Putney was at the time uncooperative and refusing to take his medicine. Even if the Court accepts the argument that Dr. Naidu's only duty was to commit Putney if Putney met the standards for involuntary commitment, there was some evidence that he should have committed this patient. Therefore, whether Dr. Naidu breached his statutory duty under circumstances which demonstrated his gross negligence was an issue properly left to the jury.

■ In support of his argument, Dr. Naidu contends that in determining wheth-er Putney manifested a threat of harm to himself or others, "it does not matter what Putney's prior psychiatric history was." According to Dr. Naidu, the law mandates that a decision whether to commit a patient must be based on present manifest indications, and that consideration of prior psychiatric history would therefore be improper. The statute does mandate that a patient exhibit manifest indications that he is a present threat to himself or others. 16 *Del.C.* § 5003. However, there is nothing to indicate that the General Assembly intended to preclude psychiatrists from considering past psychiatric history in making their assessments. In the context of this trial, there was expert testimony offered by Dr. Davis that past psychiatric history is relevant in assessing a patient's present status.[6] We agree with the Superior Court's statement that Dr. Davis' testimony was "support for the proposition that a psychiatrist's opinion for purposes of the involuntary commitment statute should be based on a patient's entire record and not merely on the most recent few days while in the hospital." To adopt the construction offered by Dr. Naidu would be to severely limit the ability of psychiatrists to make meaningful evaluations concerning a patient's present propensity for harm.

---

**5.** Upon this provisional hospitalization by a psychiatrist's certification, the hospital has six working days to file a complaint in the appropriate court seeking a judicial determination of the patient's mental state. 16 *Del.C.* § 5007. Within 18 working days of this filing, a hearing to determine whether probable cause exists for the involuntary patient's confinement must be held. 16 *Del.C.* § 5008. At such a hearing and all subsequent hearings, an involuntary patient may be entitled to the appointment of counsel. 16 *Del.C.* § 5006; *id.* at § 5008. The court must also conduct a hearing to determine mental illness. 16 *Del.C.* § 5010. The court must make a specific finding that the patient is either not mentally ill or, based upon clear and convincing evidence, that the patient is mentally ill as that term is defined by the statute. *Id.* In determining the disposition of the patient, the court shall consider all available alternatives, including inpatient confinement at the hospital, and shall order such disposition as imposes the least restraint upon the involuntary patient's liberty and dignity consistent both with affording mental health treatment and care with protecting the safety of the involuntary patient and the public. *Id.* Such order of disposition is effective for a period not exceeding six months. *Id.* If at any time during the pendency of these proceedings the hospital determines that the patient is no longer a mentally ill person, the hospital must discharge the patient. 16 *Del.C.* § 5009.

**6.** Dr. Naidu argues that the Superior Court erred in entertaining an opinion by Dr. Davis as to the statutory construction of 16 *Del.C.* § 5003. However, Dr. Davis' opinion was not offered for the purposes of shedding light on 16 *Del.C.* § 5003 and what sources a psychiatrist may consult in determining whether to commit a patient. Rather, Dr. Davis explained that a review of Putney's prior psychiatric record provided a basis for his opinion that it was not unforeseeable that Putney would again have a psychotic episode after his March 22, 1977 release. Certainly Dr. Davis was qualified to render this opinion even though, as the Superior Court found, it does provide support for the proposition that a psychiatrist's opinion on involuntary commitment should be based on a patient's entire psychiatric history.

■ The Delaware statutes concerning the care of the mentally ill do not fully define all the duties of mental health professionals. These statutes do not eliminate the common law duty to use reasonable care in the treatment and discharge of mentally ill patients to protect against reasonably foreseeable events. *See Lipari v. Sears, Roebuck & Co.*, D.Neb., 497 F.Supp. 185, 191 (1980); *Tarasoff v. Regents of the University of California*, Cal.Supr., 17 Cal.3d 425, 131 Cal.Rptr. 14, 20, 551 P.2d 334, 340 (1976); *Bradley Center, Inc. v. Wessner*, Ga.App., 161 Ga.App. 576, 287 S.E.2d 716, 721, *affd.* Ga.Supr., 250 Ga. 199, 296 S.E.2d 693 (1982); *McIntosh v. Milano*, N.J.Super., 168 N.J.Super. 466, 403 A.2d 500, 511–12 (1979); *Petersen v. State*, Wash.Supr., 100 Wash.2d 421, 671 P.2d 230, 237 (1983).

Actionable negligence is premised upon the existence of a legal duty, a breach of that duty, and injury proximately caused by the breach. *Prosser & Keeton on Torts* § 30, at 164–65. Generally, there is no duty to control the conduct of a third person to prevent him from causing harm to another unless:

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Restatement (Second) of Torts* § 315 (1965).

In *Tarasoff v. Regents of the University of California*, the California Supreme Court recognized the existence of a special relationship between a psychotherapist and a patient which provides the underlying basis for imposition of an affirmative duty owed to persons other than the patient. 131 Cal.Rptr. at 23, 551 P.2d at 343 (citing *Restatement (Second) of Torts* § 315–320 (1965)). The *Tarasoff* holding has been adopted by courts in other states which have also held that a special relationship

exists between mental health professionals and a patient which provides the underlying basis for imposition of an affirmative duty owed to persons other than the patient. *Lipari v. Sears, Roebuck & Co.*, D. Neb., 497 F.Supp. 185, 190 (1980); *Bradley Center, Inc. v. Wessner*, Ga.App., 161 Ga. App. 576, 287 S.E.2d 716, *affd.*, Ga.Supr., 250 Ga. 199, 296 S.E.2d 693 (1982); *McIntosh v. Milano*, N.J.Super., 168 N.J.Super. 466, 403 A.2d 500, 511 (1979); *Petersen v. State*, Wash.Supr., 100 Wash.2d 421, 671 P.2d 230, 237 (1983). We find the rationale of these cases persuasive. In addition, as the Superior Court stated, subsection (b) of § 315 provides an additional impetus for imposition of a duty owed to persons other than a patient when the psychiatrist is state-employed. As one court wrote:

[A] psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient is or may present a probability of danger to that person. The relationship giving rise to that duty may be found either in that existing between the therapist and the patient, as was alluded to in *Tarasoff II*,[7] or in the more broadly based obligation a practitioner may have to protect the welfare of the community ...

*McIntosh v. Milano*, 403 A.2d at 511–12.

■ We hold that the Superior Court did not err in holding that, based on the special relationship that exists between a psychiatrist and a patient, a psychiatrist owes an affirmative duty to persons other than the patient to exercise reasonable care in the treatment and discharge of psychiatric patients. Reasonable care is that degree of care, skill, and diligence which a reasonably prudent psychiatrist engaged in a similar practice and in a similar community would ordinarily have exercised in like circumstances. *See Di Filippo v. Preston*,

---

7. *Tarasoff v. Regents of the University of California*, Cal.Supr., 17 Cal.3d 425, 131 Cal.Rptr. 14,

551 P.2d 334 (1976).

Del.Supr., 173 A.2d 333, 336 (1961) (surgeons held to same standard of care and competence as other surgeons in community); *Christian v. Wilmington Gen. Hosp. Ass'n,* Del.Supr., 135 A.2d 727, 730 (1957) (physicians, surgeons, and dentists held to same standard of care as similar doctors in community). Encompassed within this affirmative duty, courts have recognized both a psychiatrist's duty to warn third persons, *Tarasoff v. Regents of the University of California,* 131 Cal.Rptr. at 20, 551 P.2d at 340, and a duty to control the actions of a mentally ill patient by taking reasonably necessary precautions. *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. at 190; *Bradley Center, Inc. v. Wessner,* 287 S.E.2d at 721; *McIntosh v. Milano,* 403 A.2d at 511; *Petersen v. State,* 671 P.2d at 237. This duty arises only when, in accordance with the standards of the profession, a psychiatrist knows or should know that his patient's dangerous propensities present an unreasonable risk of harm to others. *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. at 193. This duty requires that the psychiatrist or other mental health professional initiate whatever precautions are reasonably necessary to protect potential victims of the patient. *Id.* To that end, a psychiatrist may have a duty to warn potential victims or a class of potential victims and/or control, to some appropriate degree, the actions of the patient.

The Superior Court did not err in determining that the factual circumstances support the existence of a duty owed to Mr. Laird by Dr. Naidu. Consequently, the Superior Court did not err in denying Dr. Naidu's various motions.

■ Both the special relationship that existed between Dr. Naidu and Putney as well as Dr. Naidu's broad-based obligation to protect the public from potentially violent patients who present an unreasonable danger support imposition of an affirmative duty owed Mr. Laird. The record shows that Putney had been under Dr. Naidu's care from as early as 1969; therefore, Dr. Naidu had firsthand knowledge of Putney's longstanding and continuing dangerous propensities.

■ Whether Dr. Naidu, in accordance with the standards of the profession, knew or should have known that Putney's dangerous propensities presented an unreasonable risk of harm to himself or others and whether Dr. Naidu took reasonable precautions to protect potential victims were issues which were properly submitted to the jury. When Dr. Davis testified that Dr. Naidu was grossly negligent in the care, treatment, and discharge of Putney, a factual dispute was created; the resolution of which was for the jury. Further, medical records were presented which documented Putney's extensive history of mental illness, bouts of violent behavior, and his predictable irresponsibility in taking prescribed medicine. The Superior Court correctly stated that Dr. Naidu was chargeable with knowledge that Putney had twice been involved in automobile accidents while in a psychotic state, possessed a driver's license at the time of his release, and could be expected to drive a motor vehicle on public roadways. Further, as Dr. Davis testified, it was not unforeseeable that Putney would cease taking his prescribed medication upon release from institutional restraints and would again become a danger to himself or others, especially while driving an automobile. The record provides ample evidence to support the jury's verdict.

In this case, the duty of reasonable care does not necessarily imply that involuntary commitment was the only possible course of action. Dr. Davis testified that remedial measures such as discharge with a program for continuing care, referral to a V.A. hospital or other outpatient clinic, and implementation of a program to monitor Putney's medication could have been employed. Even if the record supported the assertion that Dr. Naidu had a statutory obligation to release Putney, Dr. Naidu was not necessarily relieved of his duty to take some other steps in the exercise of reasonable care. Dr. Davis' testimony concerning alternatives to involuntary commitment could be considered by the jury when it determined whether Dr. Naidu breached

his duty of reasonable care and was grossly negligent.

 Dr. Naidu and the *amici*, the Delaware Psychiatric Association and the National Association of State Mental Health Program Directors, contend that imposing liability on a state-employed psychiatrist for the actions of a former patient violates public policy. Specifically, they argue that no duty should be imposed on state-employed psychiatrists in situations such as that involved in this case because: 1) long term future dangerousness cannot be predicted with any acceptable degree of accuracy; and 2) mental health professionals will be discouraged from treating potentially violent patients or will grossly over-predict a patient's propensity for violence in order to avoid liability.

Whether a legally significant public policy exists is a matter of law which the court must decide unless there is legislation which resolves the matter. *Wilmington Medical Center v. Coleman*, Del.Supr., 298 A.2d 320, 322 (1972), *conformed to, Coleman v. Garrison*, Del.Super., 327 A.2d 757 (1974), *aff'd*, Del.Supr., 349 A.2d 8 (1975). We find neither of the public policy arguments put forth by the *amici* to be persuasive. First, the record does include expert testimony offered by the plaintiff that it was foreseeable with medical certainty that Putney would commit an act dangerous to others, and, of course, the verdict does not depend on a finding based on medical certainty. Further, the argument for the defense ignores the fact that courts have recognized that, under some circumstances, psychiatrists and mental hospitals may be held liable for failing to predict the dangerous propensities of their patients. *See Hicks v. United States*, D.C.Cir., 511 F.2d 407, 415–17 (1975); *Lipari v. Sears, Roebuck & Co.*, D.Neb., 497 F.Supp. 185, 191 (1980); *Baker v. United States*, S.D. Iowa, 226 F.Supp. 129, 132–35 (1964), *aff'd* 8th Cir., 343 F.2d 222 (1965); *Tarasoff v. Regents of the University of California*, Cal.Supr., 17 Cal.3d 425, 131 Cal.Rptr. 14, 20, 551 P.2d 334, 340 (1976); *Bradley Center, Inc. v. Wessner*, Ga.App., 161 Ga.App. 576, 287 S.E.2d 716, 720–21, *aff'd.* Ga.

Supr., 250 Ga. 199, 296 S.E.2d 693 (1982); *Rum River Lumber Co. v. State*, Minn. Supr., 282 N.W.2d 882, 885 (1979); *McIntosh v. Milano*, N.J.Super., 168 N.J.Super. 466, 403 A.2d 500, 511 (1979); *Petersen v. State*, Wash.Supr., 100 Wash.2d 421, 671 P.2d 230, 237 (1983). Although we recognize the inherent difficulty confronted by mental health professionals in determining whether a patient poses an unreasonable threat of harm to himself or others, this factor alone does not justify barring recovery in all cases. *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. at 192. Rather, the standard to be applied must take into consideration the uncertainty inherent in psychiatric analysis. *Hicks v. United States*, 511 F.2d at 417; *Tarasoff v. Regents of the University of California*, 131 Cal.Rptr. at 24–25, 551 P.2d at 344–45; *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. at 192.

The second public policy argument, that psychiatrists will be discouraged from treating potentially violent patients or will over-predict their propensity for harm, is unpersuasive. *See McIntosh v. Milano*, N.J.Super., 168 N.J.Super. 466, 403 A.2d 500, 514 (1979) (court rejects same argument). There is no persuasive factual support for either contention put forth by the *amici. See id.* 403 A.2d at 514–15. The possibility that these assertions by the *amici* may prove to be true is too slight for this Court to hold that a public policy now exists against imposing liability on state-employed psychiatrists. If absolution from a duty is to be evolved based on these public policy considerations, it is for the legislature to pass appropriate legislation.

In our opinion, these lines of argument misinterpret the nature of the duty imposed on mental health professionals. Recognition of an affirmative duty owed persons other than the patient does not mean that the psychiatrist is liable for the negligence of the patient. Rather, the psychiatrist will be liable only when his own negligence is responsible for the injury in question. *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. at 192; *Bradley Center, Inc. v. Wessner*, 287 S.E.2d 716, at 725.

## III. PROXIMATE CAUSE

■ Dr. Naidu's second major contention is that, as a matter of law, his treatment of Putney was not the proximate cause of Mr. Laird's death and; therefore, the Superior Court erred in denying his motions for summary judgment, directed verdict, and judgment notwithstanding the verdict. The argument relies on the principle of law that remoteness in time or space indicates the likelihood that intervening causes have prevented defendant's acts from being proximate causes of the harm. *See Prosser & Keaton on Torts* § 43, at 282–83.

As a general rule, questions of proximate cause are reserved for the trier of fact. *McKeon v. Goldstein*, Del.Supr., 164 A.2d 260, 262 (1960). Remoteness in time and remoteness in space are important considerations in determining whether a defendant's actions or omissions have been a substantial factor in causing the harm. *Prosser & Keaton on Torts* § 43, at 282–83. But, as in this case, when the trier of fact has made a factual determination as to proximate cause, the Court is not in a position to rule, as a matter of law, that physical or temporal remoteness should, of itself, bar recovery. *Id.; Restatement (Second) of Torts* § 433 comment (f) (1965).

■ Dr. Naidu does not call the Court's attention to any intervening cause which precludes his actions from being a proximate cause for Mr. Laird's death. Rather, he points out that, as a matter of policy, as the temporal span between the negligent act and the injury expands, the causal connection between the two must be regarded as more attenuated. And, he contends, the five and one-half month time span in this case was sufficient to dissipate any causal connection between Putney's discharge and the fatal accident. We disagree. In the absence of any significant intervening cause, the temporal span in this case was not sufficient to relieve Dr. Naidu of responsibility.

Dr. Naidu cites three cases as support for his argument. *Cooke v. Berlin*, Ariz. App., 153 Ariz. 220, 735 P.2d 830 (1987); *Novak v. Rathnam*, Ill.App., 153 Ill.App.3d 408, 106 Ill.Dec. 226, 505 N.E.2d 773, *cert. denied*, Ill.Supr., 116 Ill.2d 562, 113 Ill.Dec. 303, 515 N.E.2d 112 (1987); *Phillips v. Roy*, La.App., 494 So.2d 1342 (1986). However, none of these cases suggest that this Court should disregard the general rule that lapse of time is, of itself, not a bar to recovery but is rather one factor to be considered by a jury in determining the existence of proximate cause.

Thus, the five and one-half month lapse of time between Putney's release and the fatal accident was a factor which was properly left for the jury to consider when it determined whether proximate cause existed. As the Superior Court stated when it rejected the motion for summary judgment:

> While the lapse of time between release and harm is a factor, it is not controlling in the absence of any evidence that Putney's conduct was influenced by some unrelated and independent factor which broke the chain of causation.

## IV. CONCLUSION

We hold that the Superior Court did not err in denying Dr. Naidu's motions for summary judgment, directed verdict, and judgment notwithstanding the verdict. The special relationship which exists between mental health professionals and a patient provides the underlying basis for imposition of an affirmative duty owed by such professionals to persons other than the patient. That duty is to take whatever steps are reasonably necessary and available to protect an intended or potential victim(s) of the patient when the psychiatrist determines or should have determined, in keeping with the professional standards of the community, that the patient presents an unreasonable danger to that person(s).

The Superior Court did not err in determining that the facts of this case support imposition of such a duty owed by Dr. Naidu to Mr. Laird.[8] Further, the Court

---

8. When instructing the jury, the Superior Court did not err in stating:

> The basis of plaintiff's claim against each defendant is gross negligence. The plaintiff can-

did not err in ruling that sufficient evidence was presented to support the jury's verdict that Dr. Naidu breached that duty and in so doing he was grossly negligent, and that such gross negligence was the proximate cause of the fatal injury.

AFFIRMED.

not recover unless and until it is shown to you by a preponderance of the evidence that a defendant was grossly negligent and that such gross negligence was a proximate cause of the death and injuries suffered by the plaintiff....

As I have noted previously, this action is based on the gross negligence of defendants. Gross negligence is generally defined as more than ordinary inadvertence but less than conscious indifference to consequences. It has also been defined as meaning a greater want of care than is implied from the term ordinary negligence. A combination of negligent acts by the same person may constitute gross negligence....

The standard of care required by a psychiatrist is as follows: a psychiatrist owes his patient a duty to exercise that degree of care, skill and diligence which a reasonably competent psychiatrist engaged in a similar practice and in a similar community would ordinarily have exercised in like circumstances. Where a national standard of practice exists in a profession, that is the applicable standard. What is expected depends on the psychiatrist's specialization, advances in the profession, availability of facilities and proximity to special facilities.

Thus, a psychiatrist is required to possess and employ in the diagnosis and treatment of a patient the skill, knowledge, means and methods that are recognized as necessary and which are customarily followed in the diagnosis and treatment of particular cases according to the standard of those who are qualified by training and experience as psychiatrists to perform similar services in similar communities, giving due regard to the state of the profession at the time of the treatment. In employing the required skill and knowledge, he is also required to exercise the care and judgment of a reasonable person.

However, a psychiatrist is not a guarantor of good results or an insurer of a successful cure. He is not bound to employ any particular mode of treatment of a patient if the mode of treatment used by the psychiatrist is an acceptable mode of treatment under the standard applicable to psychiatrists, as I have defined that above....

A psychiatrist has a duty to take reasonable precautions to protect any person who might foreseeably be endangered by his treatment of his patient's mental problems. Anyone whose safety was reasonably foreseeably endangered by a psychiatrist's failure to meet the applicable standard of his profession in the treatment of his patient's mental problems is entitled to recover from a psychiatrist whose conduct does not meet the applicable standard of his profession.

Gross negligence of a physician may not be presumed merely from an unsuccessful result of medical treatment. Likewise, proof aided by hindsight that a psychiatrist judged wrongly may be insufficient....

Plaintiff contends that Dr. Naidu was grossly negligent in each of the following ways: in disregarding his history, that is, the history of Mr. Putney, of a pattern of abandoning his medication and subsequent violent behavior; in failing to maintain proper records while he was in the Delaware State Hospital on this occasion; in failing to commit Mr. Putney involuntarily on March 22, 1977 in light of his condition and his failure to cooperate during his treatment; in unconditionally discharging Putney from the Delaware State Hospital on a high dosage of medication; in failing to place Mr. Putney in a program involving continuity of care and regular and frequent supervision and therapy; placement in a state out-patient program; transfer to a V.A. in-patient facility, or arrangement for an earlier out-patient V.A. appointment; and in failing to supervise, follow up or inquire in any way about Mr. Putney after his discharge....