789 F.2d 236
 BLAKESLEY, Terri, Appellee,
v.
WOLFORD, D.D.S., Larry M. and Bruce M. Epker, Ph.D., D.D.S.
and Larry M. Wolford, D.D.S., Inc., Oral & Maxillofacial
Surgery, Inc., Larry M. Wolford, D.D.S., and Larry M.
Wolford, D.D.S. and Bruce M. Epker, Ph.D., D.D.S., Inc., Appellants.
 No. 85-1237.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 6, 1986.
Decided April 30, 1986.
 
 Joseph F. Roda (argued), Bernadette McKeon Hohenadel, Lancaster, Pa., for appellee.
 Thomas W. Hall, Francis E. Shields (argued), Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellants.
 Before GARTH and STAPLETON, Circuit Judges, and BISSELL, District Judge*
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 In this appeal from a jury verdict in a medical malpractice action in favor of the plaintiff Blakesley, we are asked to review the district court's choice of law applicable to the substantive issues involved in the trial of this case.
 
 
 2
 For the reasons expressed below, we hold that the district court erred in its choice of law, and accordingly we reverse and remand the case to the district court for a new trial.[1]
 
 I.
 
 3
 In 1975, Terri Blakesley, a resident of Lancaster, Pennsylvania, had her wisdom teeth removed by a dentist not a party to this action. During that procedure, Blakesley's right lingual nerve was damaged, causing Blakesley to regularly experience numbness and "electric shock-like" sensations on the right side of her tongue.
 
 
 4
 In 1981, Blakesley, seeking relief for her discomfort, was referred to two Lancaster, Pennsylvania surgeons, Drs. Aldo Jacobus and Frederick Chairsell. Although they were unable to help Blakesley, Dr. Chairsell suggested that the defendant, Dr. Larry M. Wolford, a Texas oral surgeon expert in the repair of nerve damage, examine Blakesley during his next scheduled visit to and speaking engagement in the Lancaster area. An appointment was arranged for Dr. Wolford to examine Blakesley in Pennsylvania.
 
 
 5
 On July 21, 1982, Wolford examined Blakesley at the Lancaster Cleft Palate Clinic. At that meeting, Wolford advised Blakesley that nerve graft surgery might alleviate her distress. Specifically, Wolford suggested the removal of the neuroma on her lingual nerve and the grafting of a section of the greater auricular nerve located in her neck below her left ear to replace the damaged nerve. According to Blakesley's trial testimony, Wolford informed her that removal of the portion of the greater auricular nerve would leave "a small area of numbness in [her] temple area and possibly part of [her] ear," but that other patients who had undergone similar surgery "had not had any problems with that." App. 17(t).
 
 
 6
 At the Pennsylvania consultation, Blakesley asked Wolford whether the surgery could be performed in Lancaster, Pennsylvania. Wolford specifically informed Blakesley that the operation "would have to be done in Texas." App. 19(a). At the conclusion of the examination, Blakesley told Wolford that after she had considered whether to undergo the operation, she would "let him know if [she] was going to have it done or not." App. 19(c). Wolford gave Blakesley his card, on the back of which he wrote a description of the proposed surgical procedure.[2]
 
 
 7
 After Blakesley decided to proceed with the operation, she scheduled an appointment with Wolford for the operation to be performed in Texas on October 13, 1982. On October 12, 1982, Blakesley and her fiance met with Wolford in his office at the John Peter Smith Hospital in Dallas, Texas. During that 45-minute meeting, Wolford explained the proposed surgical procedure, essentially repeating what he previously had told Blakesley at the Lancaster, Pennsylvania consultation. Following that discussion, Blakesley signed the hospital's standard operative consent form for the surgery.
 
 
 8
 The next day, October 13, 1982, Wolford performed the operation on Blakesley. However, instead of using Blakesley's greater auricular nerve as the donor nerve for the nerve graft, as Blakesley had been informed, Wolford instead grafted an alternate nerve from her neck onto her damaged lingual nerve in her tongue.
 
 
 9
 The operation proved to be unsuccessful. In the days following the surgery, Blakesley continued to experience numbness and electric shock-like sensations in her tongue. More seriously, the removal of the alternate donor nerve left Blakesley with the highly unpleasant sensations of strangulation and choking upon the slightest touch to the area of her neck from which the donor nerve had been removed. Additionally, Blakesley experienced pain and discomfort in her ear and jaw joint, purportedly caused by her jaws being propped open too long during the operation.[3]
 
 
 10
 On December 1, 1982, Blakesley filed a diversity action in the District Court for the Eastern District of Pennsylvania against Dr. Wolford, Dr. Bruce M. Epker, and Larry M. Wolford, D.D.S., Inc. alleging, inter alia, that Wolford, both individually and in his capacity as an officer of the professional corporation, performed an operation on Blakesley without her informed consent. In her complaint, Blakesley claimed she was not informed of the possible use of an alternative donor nerve and the attendant risk of injury which could result therefrom. Additionally, she alleged she was not informed of the risk of jaw joint dysfunction resulting from the operation. Blakesley contended that had she been adequately informed of these risks, she would not have proceeded with the operation. App. 21(a)-22.
 
 
 11
 On January 30, 1984, Blakesley moved in limine that the district court apply Pennsylvania law to the substantive issues involved in the instant action. In his response to that motion, Wolford argued that Texas law should apply. On March 5, 1984 the district court, agreeing with Blakesley, ruled that Pennsylvania law would govern all issues in the case.
 
 
 12
 On April 27, 1984, the jury returned a verdict in Blakesley's favor in the amount of $800,000.00.[4] The district court denied Wolford's post trial motion for a new trial, and this appeal followed.
 
 II.
 
 13
 In this appeal, Wolford contends that the district court erred in applying Pennsylvania substantive law to the issues of informed consent and damages in this action. We agree.
 
 
 14
 A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state in determining which state's law to apply to the substantive issues before it. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1005 (3d Cir.1980). As this action was brought in district court in Pennsylvania, Pennsylvania's choice of law principles determine which state's law applies to this medical malpractice action.[5]
 
 
 15
 In Griffith v. United Airlines, 416 Pa. 1, 203 A.2d 796 (1964), the Pennsylvania Supreme Court abandoned the strict lex loci delicti choice of law rule. That rule had provided that the law of the place of injury would govern in all tort actions brought in Pennsylvania courts for injuries sustained in other states. In its place, Pennsylvania's highest court adopted "a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." 203 A.2d at 805. According to the Pennsylvania Supreme Court.
 
 
 16
 "The merit of such a rule is that 'it gives to the place "having the most interest in the problem" paramount control over the legal issues arising out of a particular factual context' and thereby allows the forum to apply 'the policy of the jurisdiction "most intimately concerned with the outcome of [the] particular litigation".' Auten v. Auten, 308 N.Y. 155, 161, 124 N.E.2d 99, 102, supra.)"
 
 
 17
 203 A.2d at 806.
 
 
 18
 In Cipolla v. Shaposka, 439 Pa. 563, 267 A.2d 854 (1970), the Pennsylvania Supreme Court clarified the Griffith standard.
 
 
 19
 In determining which state has the greater interest in the application of its law, one method is to see what contacts each state has with the accident, the contacts being relevant only if they relate to the "policies and interests underlying the particular issue before the court." When doing this it must be remembered that a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than a quantitative scale.
 
 
 20
 267 A.2d at 856 (citations omitted).
 
 
 21
 In applying the Griffith/Cipolla choice of law analysis in federal diversity actions, this court has stated that Griffith
 
 
 22
 combines the approaches of both Restatement II [Conflict of Laws] (contacts establishing significant relationships) and "interest analysis" (qualitative appraisal of the relevant States' policies with respect to the controversy). It takes into account both the grouping of contacts with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction.
 
 
 23
 Melville v. American Home Assurance Co., 584 F.2d 1306, 1311 (3d Cir.1978).
 
 
 24
 The Restatement (Second) of Conflict of Laws establishes the following general principles to be applied and contacts to be taken into account in choice of law determinations in tort actions:
 
 Sec. 145. The General Principle
 
 25
 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Sec. 6 [Choice-of-Law Principles].
 
 
 26
 (2) Contacts to be taken into account in applying the principles of Sec. 6 to determine the law applicable to an issue include:
 
 
 27
 (a) the place where the injury occurred,
 
 
 28
 (b) the place where the conduct causing the injury occurred,
 
 
 29
 (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
 
 
 30
 (d) the place where the relationship, if any, between the parties is centered.
 
 
 31
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 
 Sec. 146. Personal Injuries
 
 32
 In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
 
 
 33
 Thus, we must first look to the policies and interests advanced by Texas and Pennsylvania as they relate to the two primary issues in this litigation: informed consent and damages. After examining each states' respective policies as they relate to those issues, we must then consider each states' contacts relevant to those interests and this litigation.
 
 A.
 
 34
 Pennsylvania has adopted what has commonly been referred to as the "lay" approach to informed consent. Under the lay standard, a physician must disclose to his patient "all those facts, risks and alternatives that a reasonable man in the situation which the physician [knows or should know] to be the [patient's] would deem significant in making a decision to undergo the recommended treatment." Cooper v. Roberts, 220 Pa.Super. 260, 286 A.2d 647, 650 (1971). Informed consent in Pennsylvania thus focuses on insuring that the patient be apprised of all feasible alternatives and possible adverse affects which might arise from the medical procedure.
 
 
 35
 Texas, on the other hand, has adopted a markedly different approach to its law of informed consent. There, a physician must disclose only those risks or hazards that might influence a reasonable person in deciding whether to proceed with the operation. Tex.Rev.Civ.Stat.Ann. art. 4590i, Sec. 6.02. Although facially similar to the Pennsylvania requirement, the focus in Texas as to what must be disclosed to the patient is on what the physician believes should be disclosed, not what the patient might want to know, as in Pennsylvania.
 
 
 36
 Under Texas law, a Medical Disclosure Panel, consisting of three lawyers and six physicians, is empowered to determine the specific risks and hazards peculiar to a particular medical procedure which must be disclosed to the patient. Id. at Sec. 6.03 et. seq. Once the panel has determined the proper level of disclosure, and it is shown that the physician has met that level of disclosure in a particular case, a rebuttable presumption is established that the operation was conducted with the patient's informed consent. Conversely, if the physician fails to disclose the information mandated by the Panel, a rebuttable presumption that the procedure was performed in the absence of the patient's informed consent is established. Where the Panel has not established the requisite disclosure for a specific medical procedure, then the level of informed consent required of the doctor is that which a reasonable doctor with defendant's experience would have disclosed to the patient in similar circumstances. Wilson v. Scott, 412 S.W.2d 299 (Tex.1967).
 
 
 37
 In Pennsylvania, expert testimony is not required under the "lay" standard of informed consent. Under Texas law, on the other hand, a plaintiff must establish lack of informed consent through the use of expert testimony. Wilson, 412 S.W.2d at 302.[6]
 
 B.
 
 38
 Texas and Pennsylvania law also differ substantially as to the potential damages available to a successful plaintiff in a medical malpractice action.
 
 
 39
 Pennsylvania law reflects a liberal damage policy, with no statutorily imposed cap on damage awards. Texas law applicable at the time Blakesley sustained her injuries, on the other hand, limited physicians' liability to $500,000 plus past and future medical expenses. Tex.Rev.Civ.Stat.Ann. Sec. 4590i, Sec. 11.02(a) (Vernon Supp.1984).[7]
 
 C.
 
 40
 Texas and Pennsylvania medical malpractice laws reflect and promote fundamentally different policies and interests.
 
 
 41
 Pennsylvania's liberal compensation policy and lay approach to informed consent reflect that state's strong interest in protecting patients from the hazards of medical malpractice and in insuring that victims of physicians' negligence are fully compensated for their injuries. Texas' attempted limitation on malpractice damages and its physician-oriented informed consent law represent that state's policy to limit medical malpractice claims within prescribed bounds in an effort to control health care costs and promote the general accessibility of health care in Texas.[8]
 
 
 42
 Therefore, it is clear that a true conflict exists between Pennsylvania and Texas on the issues of informed consent and damages in medical malpractice actions. Under Griffith, then, we must proceed to examine the relevant contacts of each of the two states as those contacts bear on the instant litigation.
 
 III.
 
 43
 Applying the Restatement factors, the district court examined three relevant contacts: the residence and/or citizenship of the parties; the place where the injury occurred; and the place where the conduct causing the injury occurred.[9] App. 237-39. These contacts as disclosed by the record, and as discussed by the district court, are applicable to the issues of informed consent as well as damages.
 
 
 44
 We conclude that the district court erred in its analysis of the critical factors. As a consequence, it erred in its choice of law.
 
 1. Citizenship of the Parties
 
 45
 It is undisputed that Blakesley is a citizen of Pennsylvania and that Wolford is a citizen of Texas. Given Pennsylvania's interest in protecting its citizen/plaintiffs against medical malpractice, and Texas' equally strong interest in containing health care costs as reflected by its laws more favorable to its resident physicians, the factor of the parties' citizenship is for all practical purposes neutralized inasmuch as the two interests which are identified effectively cancel each other out in this action. The district court, while not expressly so holding, nevertheless implied that the factor of the parties' citizenship created such a standoff.
 
 
 46
 2. Place where the injury occurred.
 
 
 47
 In its memorandum opinion denying Wolford's motion for a new trial, the district court stated: "Although the operation took place in Texas, the effects of that operation are felt here in Pennsylvania, where the plaintiff has been a lifetime resident, and where she will continue to reside." App. 238. From this rather cryptic statement, it appears that the district court either found that Pennsylvania was the place of injury as a matter of fact, or that regardless of the fact that Texas was the place of injury, the district court considered the relevant contact under the Restatement test to be the place where the effects of the injury will be felt, rather than the place where the injury itself occurred. Clearly, the place where the injury occurred, that is, the place where the operation which injured Blakesley took place, was undisputedly Texas. Thus, if the district court's discussion is construed as a finding of fact that Pennsylvania was the place of injury, that finding is clearly erroneous.
 
 
 48
 On the other hand, if the district court, instead of making a finding as to where the injury occurred, concluded as a matter of law that the appropriate relevant contact under the Restatement test was the place where the effects of the injury were to be felt, then the district court erred by focusing on an incorrect contact.
 
 
 49
 In all personal injury actions, the effects of an injury necessarily follow a plaintiff to his or her state of residence or domicile. It is axiomatic that wherever the plaintiff lives, the effects of his or her personal injuries will be felt. However, looking to the place where the effects of an injury will be felt gives improper additional weight to the factor of the plaintiff's state of residence. In effect, by looking to the place where the injuries are felt, rather than the place where they in fact occurred, the district court gave double weight, which was unwarranted, to Blakesley's state of residence--Pennsylvania.[10]
 
 
 50
 3. Place where the conduct causing the injury occurred.
 
 
 51
 While seemingly acknowledging the fact that the conduct causing the injury occurred in Texas, the district court stressed that the physician-patient relationship was initiated in Pennsylvania and that Blakesley traveled to Texas at Wolford's "invitation." Characterizing the evidence in this manner, the district court concluded that "the fact that the conduct took place in Texas does not weigh in favor of applying its [Texas'] laws to this case." App. 239.
 
 
 52
 The district court, in giving weight to the following evidence, disregarded the uncontradicted fact that the injury--causing conduct occurred in Texas: Blakesley initially sought medical treatment in Pennsylvania; the initial consultation and diagnosis with Dr. Wolford occurred in Pennsylvania; and, of great importance to the district court, Blakesley "entered Texas at the invitation of the defendant." App. 238-39. Since Wolford held himself out as a national expert who was in fact licensed to practice medicine in Pennsylvania, Blakesley argues, and the district court so found, Wolford could not reasonably expect to rely on Texas law when treating a patient who initially sought treatment in Pennsylvania.
 
 
 53
 On the other hand, it is uncontradicted that Wolford's sole contact with the Commonwealth of Pennsylvania was his initial consultation and diagnosis of Blakesley's condition. It was at that meeting that Wolford explicitly stated that Blakesley's operation would have to take place in Texas. Blakesley's operation would have to take place in Texas. Blakesley has never disputed that fact. Yet, inexplicably the district court found that Blakesley "did not go to Texas of her own initiative." App. 239. Our review of the record reveals that this finding of the district court is clearly erroneous.
 
 
 54
 Standing alone, the mere fact that Wolford discussed a proposed procedure in Pennsylvania does not mandate that Pennsylvania law be applied to all issues of the proceedings that followed. While it may be true that Wolford, as a national expert, could not expect to rely on Texas' limited law of liability if he practiced or performed surgical procedures in Pennsylvania, a mere consultation and diagnosis while visiting a foreign state on other business cannot support a conclusion that all further medical procedures, no matter where performed, must be governed by the law of the state of initial diagnosis.
 
 
 55
 Characterizing that initial Pennsylvania consultation as an "invitation" to come to Texas to undergo further medical procedures does not magically bring all further relationships between doctor and patient under the protective umbrella of Pennsylvania's more generous medical malpractice law. On the contrary, Blakesley's voluntary acceptance of Wolford's express condition that the operation take place in Texas, and her action in intentionally traveling to Texas for her operation, fully support a conclusion that Texas law should apply.[11]
 
 
 56
 This case falls squarely within the analysis of Cipolla v. Shaposka, 439 Pa. 563, 267 A.2d 854, 856 (1970). There, the Pennsylvania Supreme Court held that when a defendant acts within his home state, he may properly rely on that state's defendant-protecting law. As the Cipolla court stated:Inhabitants of a state should not be put in jeopardy of liability exceeding that created by their state's laws just because a visitor from a state offering higher protection decides to visit there.
 
 
 57
 267 A.2d at 856-57.
 
 
 58
 Here, the evidence is clear that Blakesley voluntarily and intentionally went to Texas to undergo her nerve-graft operation. Although she did not initially seek out Wolford in Texas, there can be no question but that she voluntarily accepted his reference and his services. In particular, she acceded to having the nerve-graft operation performed in Texas. In fact, the evidence is uncontradicted that Blakesley could not have received the benefit of Wolford's services in any state other than Texas. Blakesley was unequivocally informed of this fact and must be held to that knowledge.
 
 
 59
 Blakesley argues that her decision to undergo the operation was based on her initial Pennsylvania consultation with Wolford, and not on the information she received at the Texas meeting on the day prior to the operation. However, Blakesley also testified that if she had been informed of all the risks entailed in using a different donor nerve at the Texas meeting, she would not have gone through with the operation. This evidence supports Wolford's contention that the actual final consent for the operation took place in Texas where Blakesley executed the written consent form.
 
 
 60
 Under all of these circumstances, Wolford was fully entitled to rely on his home state's law of informed consent. Cases applying the Griffith/Cipolla test make clear that where, as here, the place where the injury occurred was not fortuitous, as for example, in an airplane crash, the place of injury assumes much greater importance, and in some instances may be determinative. See Broome v. Antlers' Hunting Club, 595 F.2d 921, 924 (3d Cir.1979) and cases cited therein.
 
 
 61
 The district court analysis plainly gives too much weight to Pennsylvania's policy favoring plaintiffs in medical malpractice actions, while at the same time giving too little weight to Texas' equally strong interest in limiting recovery from its physicians for medical malpractice. Texas' interest is not limited, as the district court implied, to making health care available solely to Texas citizens. Contrary to the district court's discussion, limiting the liability of Texas physicians to visiting patients does not work a hardship on such out-of-state patients without providing a corresponding benefit to those same out-of-state patients.
 
 
 62
 Where, as here, a specialized operation can be performed by a specialist who will operate only at a Texas hospital, Texas' laws protecting doctors act to make such a surgical procedure, which otherwise might be unavailable to out-of-state patients, available to out-of-state as well as in-state patients. Indeed, but for Texas' pro-physician laws, highly specialized procedures such as that performed here might not be available anywhere to patients such as Blakesley. Applying Texas law here thus not only benefits Texas physicians, but, arguably, also benefits out-of-state patients to whom certain medical procedures would not be available in their home states.
 
 
 63
 Where injury occurs in the course of such a procedure, it must be remembered that the out-of-state patient is not wholly without a remedy. Such a patient retains remedies against the negligent physician for malpractice. However, it is only fair that the law of the state to which the patient has voluntarily traveled, and in which the doctor has chosen to conduct the operation, be applied to adjudicate the respective rights, duties, and obligations between the parties.
 
 IV.
 
 64
 We hold that the district court erred in its choice of law in this case and, accordingly, we will reverse the judgment entered in favor of Blakesley and against Wolford. We will remand this case to the district court for a new trial, with directions that it apply Texas law rather than Pennsylvania law to all issues.
 
 
 
 *
 Honorable John W. Bissell, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Defendant Wolford also appeals a trial ruling of the district court claiming that the district court abused its discretion in permitting a chart to be given to the jury for consideration during its deliberations. The chart, which was produced on paper measuring two by three feet, was a recapitulation of an expert witness' testimony as to Blakesley's alleged lost future earnings capacity. The computations to which the expert testified were reproduced in chart form and the chart was admitted in evidence as Exhibit P-123
 Wolford objected to the admission into evidence of P-123 and to the court's ruling which allowed that exhibit to be given to the jury for use during its deliberations. On this appeal, Wolford challenges only the latter ruling which permitted P-123 to be given to the jury. In light of our disposition, we do not reach this issue.
 
 
 [2]
 The back of the card read:
 Secretary--Linda
 DX [presumably, Diagnosis]: Neuroma [with] paresthesia of right lingual nerve
 TX [presumably, Treatment]:
 
 
 [1]
 Resection of neuroma
 
 
 [2]
 Greater Auricular nerve graft to lingual nerve
 Time: 4 hr.
 App. 167.
 
 
 [3]
 According to the trial testimony, the operation was originally scheduled to last only four hours; however, due to complications caused by the substitution of an alternate donor nerve, the operation took almost seven hours
 
 
 [4]
 The verdict was returned against all the defendants. All defendants appealed from the judgment which was entered on April 30, 1984. For ease of reference, throughout this opinion we have referred to the defendants collectively as "Wolford."
 
 
 [5]
 In reviewing a lower court's choice of law determination, the district court's findings of fact will be left undisturbed if not clearly erroneous. However, our review of the district court's application of the law to the facts is plenary
 
 
 [6]
 Further, in Texas, a plaintiff alleging lack of informed consent must affirmatively demonstrate that he would not have undergone the operation had he known of possible adverse side effects not disclosed prior to the operation
 
 
 [7]
 A Texas state appellate court recently affirmed a trial court's decision striking down as unconstitutional the Texas damage cap law as applied to hospitals. Baptist Hosp. of Southeast Texas, Inc. v. Barber, 672 S.W.2d 296 (Tex.Civ.App.1984). Should this decision become the general law in Texas and apply as well to actions against private physicians such as Wolford, there would then be no conflict between Texas and Pennsylvania over damages in medical malpractice actions
 
 
 [8]
 In recent days, other legislatures have apparently contemplated adopting policies similar to Texas' limitations on malpractice damages in an effort to contain costs and retain insurance coverage. See, e.g., N.Y. Times, Apr. 9, 1986, at A26, col 1; see also Wall Street Journal, Apr. 7, 1986, at 22, col. 1
 
 
 [9]
 The district court did not consider the place where the relationship, if any, between the parties is centered. See Restatement (Second) Conflict of Laws Sec. 145(2)(d). Because the contacts that we have discussed all point to Texas law as the appropriate choice of law, and because our reading of the record reveals that the relationship between Blakesley and Wolford was centered in Texas, we attribute little importance to the district court's omission
 
 
 [10]
 If we were to hold that the place where the effects of an injury are felt is a relevant contact, it would be tantamount to establishing a per se rule that an injured plaintiff carries with him for all purposes his home state's law despite the state in which he was injured. This would clearly violate the spirit of Griffith v. United Airlines, 416 Pa. 1, 203 A.2d 796 (1964), which rejects the rigid application of per se rules focusing solely on a single and possibly fortuitous factor. The rule of lex loci delicti may not so readily be replaced with the rule of lex loci plaintiff
 
 
 [11]
 It is true, as the district court states, that "Pennsylvania has an interest in protecting its citizens who are injured by out of state physicians and surgeons who come to Pennsylvania to practice their profession, and in requiring those individuals to satisfy its standards of care and consent." App. at 239-40. However, it does not follow, as the district court stated, that "Pennsylvania's interest is just as strong when its residents travel to other states for surgical procedures prescribed by out of state surgeons during their visits to Pennsylvania." App. 240
 While we may agree with the district court in the former instance, we cannot agree with the district court's later conclusion that would have Pennsylvania law travel with Pennsylvania residents when they arrange to undergo surgical procedures in sister states.