## Troxel v. A.I. DuPont Institute

*Sol Weiss* and *Nancy Goldstein,* for plaintiffs.
*Joseph Foster* and *Jamie Shapiro,* for defendant Dr. Kevin Browngoehl.
*Fred Greenberg,* for defendant A.I. DuPont Institute.
*Jay Lambert,* for defendant Ches-Penn Health Services Inc.

HAZEL, *J.,* June 22, 1993—This opinion is written in response to the appeals of plaintiffs, defendant Kevin Browngoehl, M.D., and defendant Ches-Penn Health

Services Inc., from the court's order granting summary judgment in favor of defendant A.I. DuPont Institute.

Summary judgment, which is governed by Pa.R.C.P. 1035, is appropriately granted where:

"[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

"Further, the deciding court must view all of the evidence in a light most favorable to the non-moving party, *Rossi v. Pennsylvania State University,* 340 Pa. Super. 39, 48, 489 A.2d 828, 833 (1985), and draw all reasonable inferences in favor of the non-moving party. *Helinek v. Helinek,* 337 Pa. Super. 497, 502, 487 A.2d 369, 372 (1985). Finally, summary judgment may be rendered only in cases that are free from doubt. *Huffman v. Aetna Life and Casualty Co.,* 337 Pa. Super. 274, 277, 486 A.2d 1330, 1331 (1984)." *Stephenson v. Greenberg,* 421 Pa. Super. 1, 617 A.2d 364 (1992).

Plaintiffs, the parents of Trevor Robert Troxel, brought this action as administrators of his estate and in their own right. The well-pleaded facts, when viewed in the light most favorable to the non-moving parties, are as follows.

Grace Troxel was a long-time friend of one Mary Siple, who is not a party to this action. In December 1986, Siple became pregnant. During the course of the pregnancy, she exhibited symptomology of cytomegalovirus (CMV). On October 30, 1987, Siple gave birth to a daughter, Ashley Smith. In November 1987, Ashley came under the care of Ches-Penn and Browngoehl. On November 30, 1987, Ashley was referred to DuPont for the purpose of treating her club-toeing and microcephaly. On January 21, 1988, DuPont

received test results for Siple, which ultimately led to a provisional diagnosis of intrauterine CMV infection for Ashley. Defendants did not advise Siple to avoid close contact with pregnant women.

Plaintiff Grace Troxel became pregnant in November 1987 and was in frequent contact with Siple throughout the latter's pregnancy and following the birth of Ashley. Further, Troxel held, bathed, fed and diapered Ashley from the time of her birth. In June 1988, Siple learned from one Dr. Kaplan (not a party herein) of the contagious nature of CMV. Siple advised Troxel that she and Ashley had CMV, and that Troxel, too, might have contracted the virus. Troxel was then tested for CMV and was advised that she had the virus and that the child in utero could be infected.

On August 19, 1988, Troxel gave birth to a son, Trevor, who died three months later as a result of generalized septicemia secondary to CMV.

At all relevant times, the Troxels were citizens and residents of Pennsylvania, as were Siple and Ashley Smith. Ashley, who was treated by Dr. Browngoehl at the Ches-Penn Clinic in Chester, Pa., was referred by him to DuPont and was seen for various problems by a number of their physicians in Delaware.

DuPont is incorporated and has its principal place of business in Delaware. Dr. Borkowski, a neurologist with DuPont who treated Ashley, is a resident of Delaware, is licensed to practice in that state, and at all material times, was not licensed to practice in Pennsylvania. The alleged injury to Grace and Trevor Troxel (i.e. the contraction of CMV) occurred either in Pennsylvania or Maryland.

Following the close of pleadings, and after extensive discovery, DuPont filed its motion for summary judgment. A response thereto was filed by plaintiffs and

Browngoehl. Ches-Penn did not file a response in opposition to that motion. The court heard argument and subsequently entered an order dismissing DuPont from the case.

On appeal, appellants assert that this court erred in concluding that Delaware law, rather than Pennsylvania law, should apply to the issue of DuPont's liability, and in concluding that Delaware would not recognize a cause of action under the circumstances as set forth in *DiMarco v. Lynch Homes,* 525 Pa. 558, 583 A.2d 422 (1990).

## CHOICE OF LAW

In the case at bar, DuPont, unlike the other parties, is a citizen of Delaware, and Ashley Smith was treated at DuPont's facilities in that state. Therefore, it is necessary to determine which law should apply to this case. As was stated in *Tyson v. Great Atlantic & Pacific Tea Co. Inc.,* 812 F. Supp. 63 (E.D. Pa. 1993), "[I]n diversity actions, the choice rules of the forum state govern any conflicts of law issues."

Both sides cite *Griffith v. United Airlines Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). In *Griffith,* the Pennsylvania Supreme Court rejected the strict lex loci delicti rule which required that the law of the place where the injury occurred was applied. Rather, the *Griffith* court held that an interest analysis rule would apply, wherein the law of the state that had the more qualitatively significant contacts, would apply to the substantive issues of the case. *Id.* at 65.

The Restatement (Second) of Conflicts §379(2), while not adopted explicitly in *Griffith,* served as a model for the new choice of law rules.

"The Restatement suggests that torts should be governed by the local law of the state which has the most significant contacts to the parties and the accident. Vital contacts include the place of the injury, the place of the conduct, the domicile of the parties, and the place where the relationship between the parties is centered." *Griffith v. United,* 203 A.2d at 802, citing the Restatement (Second) of Conflicts §379(2).

An analysis of the contacts in the instant case discloses the following. Pennsylvania is the residence of plaintiffs and, at relevant times, of Mary Siple and Ashley Smith. The disease was contracted either in Pennsylvania or Maryland. During 1988, Dr. Borkowski treated other patients referred to him at DuPont from Ches-Penn and/or Dr. Browngoehl. Also during that time period, 1,752 Pennsylvania residents travelled to Delaware to be treated at DuPont. Telephone calls and/or reports were made or sent by DuPont to Siple at her residence and to Browngoehl at his office in Chester. At the time of plaintiff's injury, DuPont was engaged in discussion with Thomas Jefferson Hospital in Philadelphia regarding a joint teaching program.

The Delaware contacts are as follows. DuPont is a resident of Delaware, being incorporated and having its principal place of business there. Treatment of Ashley Smith took place in Delaware. Dr. Borkowski is a resident of Delaware; at all material times, he was licensed to practice and practiced in Delaware, *not* Pennsylvania.

In *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (1970), our Supreme Court explained that the contacts are relevant only if they relate to the "policies and interests underlying the particular issue before the court." Further, "[t]he weight of a particular state's contacts must be measured on a qualitative rather than

a quantitative scale." Finally, the court opined that "it seems only fair to permit a defendant to rely on his home state law when he is acting within that state." *Id.,* 439 Pa. at 567, 267 A.2d at 856. After weighing the relevant contacts, we conclude that the appropriate law to apply is that of Delaware, for the following reasons.

We can begin by disregarding the joint teaching program involving DuPont and Thomas Jefferson Hospital in Philadelphia. It is clear that at the time this cause of action arose, the program did not yet exist. Therefore, as a contact, it is irrelevant. We find that the fact that 1,752 Pennsylvania residents sought treatment at DuPont in 1988 is likewise irrelevant. DuPont is an internationally known children's hospital, and in 1988 there were a total of 6,056 new patients who came from 27 states other than Delaware, as well as Puerto Rico and various foreign countries. It would be speculative at best to attempt to determine why or at whose recommendation these patients sought the services of DuPont and, although plaintiffs argue that DuPont advertises and seeks out patients in Pennsylvania, there is nothing to indicate that such advertisement occurred at any time prior to Ashley Smith's treatment. We, therefore, do not attribute any weight to this factor.

Further, the residence of plaintiffs, Siple and Ashley are counterbalanced by the residence of DuPont and Borkowski, the treating neurologist. Therefore, they do not contribute to the equation.

Both Pennsylvania and Delaware have promulgated statutes dealing with health care malpractice.[1] The

___

1. See 40 P.S. §1301.101 et seq., Health Care Services Malpractice Act; 18 Del. Code §6801 et seq., Health Care Malpractice Insurance and Litigation.

Pennsylvania statute deals very generally with evidentiary matters and expert witnesses, and with respect to these matters, states, in its entirety:

"§1301.506. *Applicability of laws, rules and evidence*

"Except as provided in this act, the arbitration panel is bound by the common and statutory law of the Commonwealth, the Pennsylvania Rules of Civil Procedure, and the Pennsylvania rules of evidence.

"§1301.507. *Appointment of expert witnesses*

"The arbitration panel may, upon the application of either party or upon its own motion, appoint a disinterested and qualified expert to make any necessary professional or expert examination of the claimant of relevant evidentiary matter and to testify as a witness in respect thereto. Such an expert witness shall be allowed necessary expenses and a reasonable fee to be fixed and paid by the arbitration panel."

The Delaware statute is far more explicit in these areas, providing as follows:

"§6853. *Requirement of expert medical testimony*

"No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death, except that such expert medical testimony shall not be required if a malpractice review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence; provided, however, that a rebuttable inference that personal injury or death was caused by negligence shall arise where evidence is presented that the personal injury or death occurred in any one or

more of the following circumstances: (1) A foreign object was unintentionally left within the body of the patient following surgery; (2) an explosion or fire originating in a substance used in treatment occurred in the course of treatment; or (3) a surgical procedure was performed on the wrong patient or the wrong organ, limb or part of the patient's body. Except as otherwise provided herein, there shall be no inference or presumption of negligence on the part of a health care provider." 60 Del. Laws, c. 373, §1.

"§6854. *Expert witness*

"(a) No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider, however, that any such expert witness need not be licensed in the state.

"(b) Any physician who has been in the active practice of medicine or surgery for at least the past five years and who currently practices in the state or within a state contiguous to the state and within a radius of 75 miles of the capital of the state shall be presumed to be competent to give expert medical testimony as to applicable standards of skill and care, if it shall be established that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standard as the skill and care employed in the community or locality where the alleged malpractice occurred." 60 Del. Laws, c. 373, §1; 62 Del. Laws, c. 274, §1.

Section 6854 has been construed to have as its intention the elimination of "wandering experts," but is not designed to preclude testimony of every out-of-state

expert. Rather, it requires a familiarity with the standard of care for a particular practice in the locality where the malpractice allegedly occurred, at the time of the injury. This familiarity may be acquired in many ways. *Loftus v. Hayden,* 391 A.2d 749 (1978). A non-exclusive list of factors which a court may consider in determining the competency of an expert medical witness to testify as to the applicable standard of care, was set forth in *Taylor v. Wilmington Medical Center Inc.,* 577 F. Supp. 309 (D. Del. 1983), *aff'd* 780 F.2d 1016 (3d Cir. 1985).[2] It would thus appear that Delaware has statutorily expressed a far greater interest in this most significant area than has Pennsylvania. There is a clear concern that health care practitioners in Delaware be judged upon the standard of care in their community. The Pennsylvania statute is virtually silent on this issue.

Moreover, a factor of great importance is the place where the tort occurred. In determining the "place of the tort," one can look to the place of the conduct causing the injury, or the place where the injury, itself, occurred. (See Restatement (Second) Conflict of Laws §145.) In the instant case, the injury, i.e. the contraction of CMV, occurred either in Pennsylvania or Maryland. Plaintiff does not know where the disease was contracted, and thus, little, if any, weight can be accorded

---

2. Factors among those the court may consider in determining the competency of an expert medical witness to testify to the applicable standard of care include: (1) Direct observation in Delaware; (2) study in Delaware (as a medical student on rotation, an intern or resident); (3) care of Delaware patients referred by Delaware physicians; (4) teaching of students who have dispersed to Delaware; (5) reading of Delaware medical records, reports, journals, etc.; (6) consultations with Delaware physicians; and (7) attendant at meetings with Delaware doctors. *Id.*

to this factor. The alleged negligence is the failure to warn. It seems logical that the omission to act can only occur where the party who allegedly should have acted is located. If not, it could be said that the party failed to act in every part of the world. Such a result would be ludicrous, and we therefore must conclude that the alleged negligent omission occurred in Delaware, the location of DuPont.

Additionally, although Siple was a resident of Pennsylvania, she accepted the recommendation of her pediatrician, and voluntarily chose to go to Delaware to obtain treatment for her child. The child was treated in Delaware, and although there were telephone calls and correspondence that went between the states (among DuPont, Browngoehl and Siple), all treatment of Ashley by DuPont occurred in Delaware. Significantly, neither Grace nor Trevor Troxel was ever a patient of, or had any contact with DuPont prior to this litigation.

We find the case of *Blakesley v. Wolford,* 789 F.2d 236 (1986), instructive on this issue. In *Blakesley,* a Pennsylvania resident was referred to a Texas oral surgeon who was a nationally recognized expert in the repair of oral nerve damage. The plaintiff consulted with the doctor, who happened to be in Pennsylvania as a participant in a local lecture series, and certain discussions were held here. The plaintiff later travelled to Texas where the surgery was performed. The procedure was unsuccessful, and the plaintiff instituted a malpractice action in the U.S. District Court for the Eastern District of Pennsylvania. The District Court granted the plaintiff's motion in limine to employ Pennsylvania substantive law. The Third Circuit Court reversed and remanded, holding that Texas law should apply to all issues. The Circuit Court stated:

"If we were to hold that the place where the effects of an injury are felt is a relevant contact, it would be tantamount to establishing a per se rule that an injured plaintiff carries with him for all purposes his home state's law despite the state in which he was injured. This would clearly violate the spirit of *Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796 (1964), which rejects the rigid application of per se rules focusing solely on a single and possibly fortuitous factor. The rule of lex loci delicti may not so readily be replaced with the rule of lex loci plaintiff." *Blakesley, supra,* at 241-42 n.10.

The main focus of the Third Circuit's analysis, however, was the place where the conduct causing the injury occurred. The District Court determined that because the physician-patient relationship was initiated in Pennsylvania, and that the plaintiff travelled to Texas at the defendant's "invitation," this somehow outweighed the fact that the injury actually occurred in Texas. The Third Circuit found this determination to be "clearly erroneous":

"Blakesley's voluntary acceptance of Wolford's express condition that the operation take place in Texas, and her action in intentionally travelling to Texas for her operation, fully support a conclusion that Texas law should apply." *Blakesley, supra,* at 242. The court continued in a footnote:

"It is true, as the District Court states, that 'Pennsylvania has an interest in protecting its citizens who are injured by out-of-state physicians and surgeons who come to Pennsylvania to practice their profession, and in requiring those individuals to satisfy its standards of care and consent.' App. at 239-40. However, it does not follow, as the District Court stated, that 'Pennsylvania's interest is just as strong when its residents

travel to other states for surgical procedures prescribed by out-of-state surgeons during their visits to Pennsylvania.' App. 240.

"While we may agree with the District Court in the former instance, we cannot agree with the District Court's later conclusion that would have Pennsylvania law travel with Pennsylvania residents when they arrange to undergo surgical procedures in sister states." *Blakesley, supra,* at 242 n.11.

Finally, the Circuit Court determined that the appropriate analysis to apply was that of *Cipolla, supra:*

"Here, the evidence is clear that Blakesley *voluntarily* and *intentionally* went to Texas to undergo her nerve-graft operation. Although she did not initially seek out Wolford in Texas, there can be no question that she voluntarily accepted his reference and his services." *Blakesley, supra,* at 243. (emphasis in original)

The court concluded that "Wolford was fully entitled to rely on his home state's law of informed consent." *Id.* As a final note, the court indicated its awareness of the fact that the plaintiff would effectively be precluded from recovery against Dr. Wolford under Texas law. However, such a result clearly did not outweigh the unfairness to the defendant physician:

"Where injury occurs in the course of such a procedure, it must be remembered that the out-of-state patient is not wholly without a remedy. Such a patient retains remedies against the negligent physician for malpractice. *However, it is only fair that the law of the state to which the patient has voluntarily travelled, and in which the doctor has chosen to conduct the operation, be applied to adjudicate the respective rights, duties, and obligations between the parties." Blakesley, supra,* at 243. (emphasis added)

APPLICABLE DUTY OF CARE

Having determined that Delaware law controls the issues in this case, we turn to the question of whether that law imposes a duty of care upon physicians *vis-a-vis* third parties. Plaintiff argues that the Delaware courts are likely to follow Pennsylvania's lead in imposing such a duty, as set forth in *DiMarco v. Lynch Homes-Chester County,* 525 Pa. 558, 583 A.2d 422 (1990).

In *DiMarco,* a blood technician who was accidentally exposed to hepatitis sought medical treatment from the defendant doctors, who advised her that if she remained symptom-free for a period of six weeks, she would not have been infected by the virus. She was not advised to refrain from sexual relations for any period of time, but did so for a period of eight weeks, at which time she resumed relations with the plaintiff, with whom she was living, but to whom she was not married. Plaintiff filed suit, alleging that the doctors were negligent in failing to warn their patient that having sexual relations within six months of the exposure could cause her sexual partner to contract the disease.

The trial court dismissed the complaint on preliminary objections on the ground that the doctors owed no duty of care to the plaintiff because there was no privity. The Superior Court reversed, basing its opinion on the Restatement (Second) of Torts §324A(c), which provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for the physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if ...

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

The Supreme Court granted allowance of appeal, and affirmed the decision of the Superior Court. In doing so, it quoted with approval the language of Superior Court Judge Frank Montemuro Jr., writing for the majority:

"The Disease Prevention Control Law of 1955 requires a physician who treats or examines a person suffering from or who is suspected of having a communicable disease to make a prompt report to the local board of health, or if necessary to the State Health Center of the Department. See 35 P.S. §521.3; 28 Pa. Code §21.115 specifically requires physicians to report cases of Hepatitis B."

It should first be noted that Delaware law has not adopted section 324(A) of the Restatement, which formed the basis for the opinion in *DiMarco*. Our research discloses four cases under Delaware law which extend liability on the part of a health care provider to persons outside of the physician-patient relationship, and these involve alleged psychiatric malpractice. The leading case is *Naidu v. Laird,* 539 A.2d 1064 (1988), which was a wrongful death action arising from an intentional automobile collision caused by Dr. Naidu's patient, one Putney. This patient had an extensive history of mental illness dating from 1959, including 19 hospital admissions. In 1977 Putney was committed voluntarily but was certified as a "dangerously mentally ill person dangerous to self and others." Shortly thereafter, Putney requested discharge. Because this had been a voluntary commitment, the treatment team, headed by Naidu, had to determine whether to commit him involuntarily or release him. It opted to release him. Subsequently, Putney deliberately drove his car into the Laird vehicle.

At trial and on appeal, Dr. Naidu argued that he owed no duty of care to protect the public at large from Putney. The Delaware Supreme Court specifically held that based on the special relationship that exists between a psychiatrist and a patient, a psychiatrist owes an affirmative duty to persons other than the patient to exercise reasonable care in the treatment and discharge of psychiatric patients. 539 A.2d at 1072. This holding was based upon the Restatement (Second) of Torts §315, which states:

"Generally, there is no duty to control the conduct of a third person to prevent him from causing harm to another unless:

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) a special relation exists between the actor and the other which gives to the other a right of protection."

Our research discloses no cases which have extended the duty found in *Naidu* and based upon the Restatement section 315, to health care professionals other than psychiatrists. We believe that the Delaware courts would not find that a "special relationship," as required by section 315, exists in the instant case, and would not impose a duty upon DuPont on that basis.

The *Naidu* court pointed out that Delaware statutes concerning the care of the mentally ill do not define all the duties of mental health professionals, but acknowledged the common law duty to use reasonable care in the treatment and discharge of mentally ill patients. 539 A.2d at 1072. It further stated that:

"The duty arises only when, *in accordance with the standards of the profession,* a psychiatrist knows or should know that his patient's dangerous propensities present an unreasonable risk of harm to others." 539

A.2d at 1073. (emphasis added) The key to the issue is the reasonableness under the circumstance, based upon the standard of care in the profession.

The Delaware State Board of Health has promulgated Regulations for the Control of Communicable and Other Disease Conditions (adopted in 1984 and amended in 1986, 1989 and 1990). Pertinent portions of these regulations are as follows:

"PART II

"DEFINITIONS

"When used in parts II and III, the following terms shall mean:

"(6) 'Communicable disease'—An illness due to a specific infectious agent or its toxic products which arises through transmission of that agent or its products from a reservoir to a susceptible host either directly as from an infected person or animal or indirectly, through an intermediate plant or animal host, vector or the inanimate environment."

"PART III

"REGULATIONS

"Section 1. *Notifiable Diseases or Conditions to be Reported*

"The list of notifiable diseases or conditions (notifiable diseases), specified in the appendix to these regulations, are declared as dangerous to the public health. The occurrence or suspected occurrence of these diseases, including those who at the time of death were so affected, shall be reported as defined in section 3 to the County Health Officers. Such reports shall be made within 48 hours of recognition except as otherwise

provided in these regulations. Reports shall be made by telephone or in writing except for certain specified diseases as indicated by a (T) which shall be reported immediately by telephone. Certain diseases are reportable in number only and are indicated by a (N). The Bureau may list additional diseases and conditions on its reporting forms for which reporting is encouraged but not required."

"APPENDIX

"NOTIFIABLE DISEASE

"(1) Acquired Immune Deficiency Syndrome
"(2) Amebiasis
"(3) Anthrax (T)
"(4) Botulism (T)
"(5) Brucellosis
"(6) Campylobacteriosis
"(7) Chancroid
"(8) Chlaymdia [sic] trachomatis Infections (N)
"(9) Cholera (T)
"(10) Condylomata acuminate (venereal warts) (N)
"(11) Diphtheria (T)
"(12) Encephalitis
"(13) Foodborne Disease
"(14) Giardiasis
"(15) Gonococcal Infections
"(16) Granuloma Inguinale
"(17) Hansen's Disease (Leprosy)
"(18) Hepatitis (viral—all types)
"(19) Herpes (N)
"(20) Histoplasmosis

"(21) Human Immunodeficiency Virus (HIV)

"(22) Influenza (N)

"(23) Lead Poisoning

"(24) Legionnaires Disease

"(25) Leptospirosis

"(26) Lyme Disease

"(27) Lymphogranuloma Venereum

"(28) Malaria

"(29) Measles (T)

"(30) Meningitis (bacterial)

"(31) Meningitis (aseptic)

"(32) Meningococcal Disease (other)

"(33) Mumps

"(34) Pertussis

"(35) Plague (T)

"(36) Poliomyelitis (T)

"(37) Psittacosis

"(38) Rabies (man, animal) (T)

"(39) Reye's Syndrome

"(40) Rocky Mountain Spotted Fever

"(41) Rubella

"(42) Rubella, Congenital Syndrome

"(43) Salmonellosis

"(44) Shigellosis

"(45) Smallpox (T)

"(46) Syphilis

"(47) Tetanus

"(48) Toxic Shock Syndrome

"(49) Trichinosis

"(50) Tuberculosis

"(51) Tularemia

"(52) Typhoid Fever (T)

"(53) Typhus Fever

"(54) Vaccine Adverse Reactions

"(55) Waterborne Disease Outbreaks (T)

"(56) Yellow Fever (T)"

In addition to the list of "notifiable diseases" in the appendix, the regulations also address, at section 7, the "Control of Specific Communicable Diseases." These include: vaccine preventable diseases, ophthalmia neonatorum, rabies, sexually transmitted diseases (chlamydia, gonorrhea, hepatitis B, syphilis, canchroid, herpes, lymphogranidoma venereum, AIDS, granuloma inguinale, pelvic inflammatory disease, HIV and condylomata acuminata) and tuberculosis. Given the exhaustive nature of these lists of communicable diseases which must be reported to health officials, CMV is conspicuous by its absence. Thus, it would appear that Delaware health authorities do not consider CMV in the same class as other contagious or communicable diseases. It is interesting to note that hepatitis B, which was the disease contracted by the plaintiff in *DiMarco, is* among those diseases which must be reported.

The purpose of these regulations is to prevent the spread of communicable diseases, and then impose a duty on various classes of individuals and institutions, including doctors and hospitals, which must report instances of such disease to the appropriate authorities. (Part III, §3). There is no duty imposed on DuPont by statute or regulation to report any communicable disease to a private individual, and no reference whatsoever to CMV.

We find this case analogous to *Heigert v. Riedel,* 206 Ill. App. 3d 556, 151 Ill. Dec. 789, 565 N.E.2d 60 (1990), *app. den.,* 139 Ill.2d 596, 159 Ill. Dec. 107, 575 N.E. 2d 914 (1991). In *Heigert,* a nurse who contracted tuberculosis from a patient brought an action against defendant physicians for their alleged negligence in failing to timely diagnose the patient's tuberculosis and to warn her that it was in a contagious stage. The

Illinois court noted that there was a dearth of case law regarding the duty of a physician in the context of medical malpractice actions involving communicable diseases. It pointed out that only two jurisdictions had adopted the view that a physician treating a communicable disease has a duty to warn those attending the patient and members of the patient's family regarding the nature of and prevention of the spreading of the disease. *DiMarco* was one of the two cases cited in this regard.

Notwithstanding the fact that Illinois had adopted section 324A of the Restatement (Second) of Torts, and that the court could see justification for extending the protection afforded family members to health care providers, it concluded that under the "bright line" test articulated by the Illinois Supreme Court regarding the scope of a physician's duty in medical malpractice cases, the plaintiff had failed to state a cause of action.

"[A] plaintiff cannot maintain a medical malpractice action absent a direct physician-patient relationship between the doctor and plaintiff or a special relationship ... between patient and the plaintiff."

The Delaware courts have recognized a cause of action by third parties, sounding in medical malpractice, only in situations involving psychiatric treatment. In the five years since *Naidu* was decided, they have declined to extend its holding.

We therefore find that under Delaware law, DuPont had no duty with respect to Troxel, nor was it reasonably foreseeable that Troxel, as opposed to any other member of the general public, would be harmed by Siple's or Ashley's "dangerous propensities" (i.e. as carriers of CMV). Under such circumstances, DuPont's motion for summary judgment was properly granted.